**MICHELIN TIRES (CANADA) LTD.,**
**Plaintiff, Appellant,**

v.

**FIRST NATIONAL BANK OF BOSTON,**
**Defendant, Appellee.**

**No. 80–1830.**

United States Court of Appeals,
First Circuit.

Argued June 4, 1981.
Decided Dec. 4, 1981.

Ralph Arnoldy, P.C., Boston, Mass., with whom Allen S. Feinstein, and Arnoldy & Wilcon, P. A., Boston, Mass., were on brief, for appellant.

James F. McHugh, Boston, Mass., with whom S. Elaine Renfro and Bingham, Dana & Gould, Boston, Mass., were on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, and MAZZONE,* District Judge.

* Of the District of Massachusetts, sitting by designation.

MAZZONE, District Judge.

This appeal is from a district court's denial of restitution to the plaintiff, a contractual obligor, of monies mistakenly paid to the defendant, an assignee of contract rights. We begin with a summary of the record.

Michelin Tires (Canada) Ltd. ("Michelin"), a Canadian corporation based in New Glascow, Nova Scotia, and J. C. Corrigan, Inc. ("JCC"), a building contractor, entered into an agreement on June 19, 1970 for the design and installation of a carbon black handling and storage system, which was to form part of a Michelin tire factory under construction in Pictou County, Nova Scotia. Michelin entered into the agreement through its agent, Surveyor, Nenniger & Chenevert ("SNC"), an engineering firm retained by Michelin to procure and supervise the building of the factory.

The construction contract provided that Michelin would make periodic progress payments to JCC in the amount of 90% of each invoice submitted by JCC for work completed. The amounts due were based on a schedule of values of the various parts of the entire project. JCC's invoices were to be submitted first to SNC for its review and certification that the work had been performed and the amount was correct. That certification was contained in an Engineers Progress Certificate ("EPC") and was completed by the SNC project manager. With each invoice, Michelin had the right to require JCC to submit a "Statutory Declaration," or sworn statement, stating the amount JCC owed to subcontractors, supplier, and others in connection with the work and listing any claims that could result in liens on Michelin's property. If JCC failed to make prompt payments to subcontractors and suppliers, SNC could withhold or nullify its certification and Michelin could deduct from its progress payments to JCC the amount necessary to protect its property from liens.

Prior to signing the construction contract with JCC, neither SNC nor Michelin made inquiries concerning JCC's financial situation. Initially, SNC had requested that JCC provide a performance bond to cover its work, and JCC had requested that Michelin provide a letter of credit to cover the payments due for work performed. Michelin, or SNC, dropped its proposal that JCC be required to provide a performance bond in return for JCC's withdrawal of its request for a letter of credit for Michelin.

The First National Bank of Boston ("FNB"), a commercial bank in Boston, Massachusetts, provided financing to JCC under a longstanding agreement dating from 1960. Under that agreement, FNB agreed to loan JCC an amount not greater than 80% of JCC's outstanding invoices. In return, FNB took a security interest in all JCC's accounts receivable and contract rights—including, of course, JCC's right to receive payments under its contract with Michelin.

On August 14, 1970, two months after the construction contract was executed, JCC assigned its rights under the contract to FNB. The bank notified SNC of the assignment and requested that future JCC invoices be paid directly to FNB. This assignment was acknowledged by SNC on September 3, 1970.

Shortly after JCC's assignment of its contract rights to FNB, Michelin sent FNB the payments it seeks to recover in the instant suit. The first payment was in response to JCC's invoice of August 24, 1970 in the amount of $118,000. JCC presented no EPC and no Statutory Declaration in support of this invoice. SNC prepared an EPC for the invoice and asked JCC to submit a Statutory Declaration with future invoices. Michelin paid 90% of the invoice, to FNB, as provided by the construction contract.

JCC submitted its next invoice on September 23, 1970 in the amount of $187,000. As with the previous invoice, no Statutory Declaration was presented. Michelin withheld payment and asked JCC to submit the Statutory Declaration. JCC did so on October 16, 1970.

JCC then sent Michelin an invoice dated October 22, 1970 in the amount of $313,000, accompanied by a Statutory Declaration

and an EPC. Michelin paid 90% of the amounts of the latter two invoices on December 15, 1970, deducting amounts for uncompleted work and for a change order.

Michelin's last payment to FNB was in response to JCC's invoice for $200,000, dated December 21, 1970. JCC sent the corresponding Statutory Declaration to Michelin on January 18, 1971, and Michelin sent its progress payment to FNB on January 20, 1971, including the amount previously withheld for uncompleted work.

It was not until March of 1971 that Michelin learned that JCC had not been paying its subcontractors. Accordingly, the above progress payments were not due under the construction contract, and JCC's Statutory Declarations of October 12, 1970 and January 18, 1971 were fraudulent, JCC made an assignment for the benefit of creditors on April 6, 1971 and was subsequently adjudicated a bankrupt.

The carbon black system was substantially completed by May 1, 1971, and the district court found that JCC performed all the work it could have done prior to May 1, 1971. JCC left, however, a total indebtedness of over $500,000 (Canadian) after its adjudication in bankruptcy.

Throughout this time, FNB maintained its lending relationship with JCC. FNB knew of JCC's financial difficulties. By early 1970, before JCC contracted with Michelin, FNB regarded its loan to JCC as a problem and was concerned about repayment. The bank knew from examining JCC's books that the company's earnings were declining, its trade debt was rising, and its customers were slow to pay. It was further evident from JCC's books that JCC was overstating its income in its reports to the bank. By late August of 1970, the bank was aware that JCC's outstanding indebtedness was greater than the agreed-upon loan ceiling of 80% of JCC's accounts receivable, and a bank officer reminded JCC that loan funds received while JCC was "over-advanced" were to be used only to meet payroll and pay taxes. FNB used the payments it received from Michelin after the assignment to reduce the outstanding amount on its loan to JCC. In October of 1970, FNB sent an inquiry to SNC to verify the accuracy of copies of invoices the bank had received from JCC, used by the bank to calculate the 80% loan ceiling. SNC replied that the invoices were "OK."

The district court specifically found that FNB knew of JCC's contractual obligations to Michelin. Those obligations included prompt payment of subcontractors. FNB, however, did not know that JCC was sending false Statutory Declarations to Michelin, stating under oath that the subcontractors had been paid.

On December 22, 1970, FNB notified JCC that it would extend no further loans to JCC after March 31, 1971 and that JCC should seek financing elsewhere. It was after JCC failed to find a new lender that the company made its assignment for the benefit of creditors on April 6, 1971 and filed a petition in bankruptcy.

▆▆ After discovering JCC's fraud, Michelin brought this suit to recover the payments it made to FNB, a total of $724,197.60. Michelin asserted it was entitled to restitution under two theories. First, it claimed that since its right to restitution arose from its contract with JCC, the claim could be successfully asserted against FNB, the assignee of contract rights to payment, pursuant to § 9–318(1)(a) of the Uniform Commercial Code (UCC), Mass.Gen.Laws Ann. ch. 106, § 9–318(1)(a).[1] Second, Miche-

---

1. Michelin's complaint framed this claim as one in breach of contract. On appeal, however, Michelin characterizes the claim as purely restitutionary, although "arising from" its contract with JCC. Apparently, then, Michelin is not attempting to assert that it is entitled to restitution as an alternative remedy for breach of contract. If it were, Michelin would have to show the breach was total, warranting rescis-

sion of the contract. See 5 A. Corbin, Corbin on Contracts § 1104 (1964). On the other hand, restitution of property transferred in the course of performance of a contract can be had under equitable principles without regard to the totality of the breach. See Restatement of Restitution § 28, Comment a (1937).

Given our interpretation of § 9–318(1)(a) of the UCC, we need not reach the next ques-

lin asserted that FNB was liable because it has been unjustly enriched under traditional restitutionary principles.

The district court tried the case without a jury and upon a stipulated record. In a detailed memorandum, the court found that JCC had breached its contract with Michelin by submitting fictitious invoices and fraudulent Statutory Declarations and by failing to pay its subcontractors when payment was due. It further found that Michelin's payments to FNB had been made in reliance on the fraudulent Statutory Declarations. The district court then ruled, first, that § 9–318(1)(a) does not create a new affirmative cause of action by an account debtor as against an assignee and, second, that since FNB did not know of the fraudulent Statutory Declarations or of JCC's indebtedness to subcontractors, FNB had not been unjustly enriched at the expense of Michelin. This appeal followed.

We affirm because we believe that (1) § 9–318(1)(a) of the UCC was not intended to create a new cause of action by an account debtor against an assignee and (2) the facts the district court found were available to FNB did not put it on notice of JCC's fraud and Michelin's mistake.

### I.

Michelin's first argument is that it has an independent cause of action against FNB under § 9–318 of the UCC, Mass.Gen.Laws Ann. ch. 106, § 9–318 (West Supp.1981). That section reads in pertinent part:

Defenses Against Assignee; Modification of Contract After Notification of Assignment; Term Prohibiting Assignment Ineffective; Identification and Proof of Assignment.

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9–206 the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor

and any defense or claim arising therefrom.

In essence, Michelin contends that its restitution claim arises from its contract with JCC, and that § 9–318(1)(a) accordingly permits Michelin to recover from FNB as JCC's assignee. Although Michelin emphasizes the narrow application of this theory to the instant case, the theory rests upon a construction of § 9–318 that would impose full contract liability on assignees of contract rights. Under this view, a bank taking an assignment of contract rights as security for a loan would also receive as "security" a delegation of duties under the contract and the risk of being held liable on the contract in place of its borrower. We do not believe it was the intent of § 9–318(1)(a) to create such a result.

The key statutory language is ambiguous. That "the rights of an assignee are *subject to* . . . (a) all the terms of the contract" connotes only that the assignee's rights to recover are limited by the obligor's rights to assert contractual defenses as a set-off, implying that affirmative recovery against the assignee is not intended. *See Englestein v. Mintz*, 345 Ill. 48, 61, 177 N.E. 746, 752 (1931), *quoted in Anderson v. Southwest Savings & Loan Association*, 117 Ariz. 246, 248, 571 P.2d 1042, 1044 (1977):

The words "subject to," used in their ordinary sense, mean "subordinate to," "subservient to," or "limited by." There is nothing in the use of the words "subject to," in their ordinary use, which would even hint at the creation of affirmative rights.

On the other hand, the use of the word "claim" raises the possibility that affirmative recovery was indeed contemplated. However, the section's title and the official Comment support the view that the section does not create affirmative rights. The title reads, "Defenses Against Assignee." Official Comment 1 states in pertinent part:

tion—whether this claim, essentially one in equity, can nevertheless be said to "arise from"

the contract.

Subsection (1) makes no substantial change in prior law. An assignee has traditionally been subject to defenses or set-offs existing before an account debtor is notified of the assignment.

Under prior law, an assignee of contract rights was not liable on the contract in the place of his assignor. *Wright v. Graustein*, 248 Mass. 205, 142 N.E. 797 (1924). Common sense requires that we not twist the "precarious security"[2] of an assignee into potential liability for his assignor's breach.

It is evident that § 9–318 has become a red herring in suits against an assignee. We note two cases that have denied account debtors the right to sue. *James Talcott, Inc. v. Brewster Sales Corp.*, 16 UCC Rep. Serv. 1165 (N.Y.Sup.Ct.1975); *Meyers v. Postal Finance Co.*, 287 N.W.2d 614 (Minn. 1979). There are also cases that have allowed affirmative claims, at least in limited circumstances. *Benton State Bank v. Warren*, 263 Ark. 1, 562 S.W.2d 74 (1978); *Farmers Acceptance Corp. v. DeLozier*, 178 Colo. 291, 496 P.2d 1016 (1972); *K Mart Corp. v. First Penn. Bank*, 29 UCC Rep. Serv. 70 (Pa.1980).

The decisions permitting an affirmative suit all rely on the pre-UCC case of *Firestone Tire and Rubber Co. v. Central Nat. Bank*, 159 Ohio St. 423, 112 N.E.2d 636 (1953). There the court required the bank to return payments to an account debtor because, although the bank was innocent of the assignor's fraud, the bank had unwittingly assisted that fraud by independently requesting periodic payment from the account debtor. The bank attached invoices from the assignor to each request thereby impliedly representing that the underlying obligation was valid. The court found that the account debtor relied on the genuine-

ness of the invoices forwarded by the bank. *Id.* 112 N.E.2d at 639. In the case at hand there was no such reliance. Rather, Michelin established its own system of assuring compliance, including approval of an intermediary, SNC. In addition, they required a Statutory Declaration under oath from JCC. The stipulated record indicates that FNB had no involvement in verifying JCC's performance and was completely unaware of the Statutory Declaration.

*Benton State Bank, supra*, represented a situation similar to *Firestone*. In *Benton State Bank* the bank advanced progress payments to the assignor. Each request for a progress payment was then forwarded by the bank to the general contractor accompanied by the assignor's certification, a representation similar to the Statutory Declaration submitted by JCC in this case. The court permitted the contractor to recover against the bank because the bank "had solid reasons for suspecting the truth of Harp's [the assignors] assertions, which the bank forwarded to the Warrens [the account debtors], that all past-due bills for labor and materials had been paid." *Id.*, 562 S.W.2d at 76. FNB did not assume an active role in sending JCC's statements to Michelin, nor were they even aware of JCC's misrepresentation to Michelin in any way.

The bank in *K Mart Corp., supra*, was also actively involved in the relationship between the account debtor and the assignor. In *K Mart Corp.*, the court permitted the account debtor, K Mart, to recover from the assignee certain payments made for goods that were later found to be defective. *Id.* at 707. However, the recovery permitted in *K Mart Corp.* is best viewed as merely anticipated repayment. For nearly 8

---

**2.** This phrase was coined by Professor Gilmore in his article, *The Assignee of Contract Rights and His Precarious Security*, 74 Yale L.J. 217 (1964). This article has been the source of some of the confusion regarding section 9–318. In it, Professor Gilmore analyzes the early case of *Firestone Tire and Rubber Co. v. Central National Bank*, 159 Ohio St. 423, 112 N.E.2d 636 (1953), and concludes that account debtors should be entitled to sue for repayment of funds mistakenly transferred to assignees even

if the transfer was negligent, so long as the assignee has not changed its position. With all due respect to Professor Gilmore, we disagree with this conclusion for the reasons stated in this opinion. We further note, however, that even under Gilmore's analysis, Michelin's suit would fail here since Massachusetts law suggests that a bank's crediting of a debtor's account involves a change of position. *Merchants' Insurance Co. v. Abbott*, 131 Mass. 397 (1881).

years the bank accepted payment from K Mart equal to the value of the assignor's, PSM, invoices *minus* an allowance for defective goods received and paid for in the prior month. The assignor's bankruptcy prevented such an adjustment on the final payment so the court allowed recovery. The court noted "that merely because PSM is bankrupt and can no longer be expected to repay K Mart, the bank may not now *unilaterally ignore its prior understanding, which was clearly in the contemplation of the parties,* and retain funds which should not have been paid to it initially." *Id.* at 706 (emphasis added). There is no indication that Michelin and FNB agreed to make periodic adjustments depending upon the quality of JCC's performance.

Finally, the Colorado Supreme Court permitted recovery by the account debtor against the assignee in *DeLozier, supra.* The extent of the involvement by the assignee, Farmers Acceptance Corp. ("FAC"), in the underlying contract is ambiguous in that case. The brief opinion indicates that FAC, first used the payment it received from the account debtor to satisfy the personal indebtedness of the assignor and then applied the remainder to the assignor's unpaid account with a materialman. *Id.,* 496 P.2d at 1017. This latter payment to the subcontractor's creditor suggests knowledge and involvement by the assignee that exceeds that of FNB. In the case before us, the stipulated facts indicate that FNB had no involvement in the payments by JCC to its subcontractors. In any event, to the extent that *DeLozier* can be read to permit an affirmative suit against a lender who is completely unrelated to the underlying contract, we decline to follow this departure from traditional common law principles of restitution. *See Massey-Ferguson Credit Corp. v. Brown,* 173 Mont. 253, 567 P.2d 440, 443 (1977).

In each of the cases permitting an affirmative suit, with the possible exception of *DeLozier,* the assignee actively participated in the transactions to a degree not approached here. We are aware of no case that has gone beyond those we have cited and actually permitted an affirmative suit

against a nonparticipating assignee like FNB. We do not anticipate that the Supreme Judicial Court would extend the law in this way and we are unwilling to do so ourselves. Given the factual distinctions between the cases discussed above and the transactions at issue here, we do not need to reach the issue of whether Massachusetts law would permit suit against an assignee who became more involved in the course of dealings.

While it is our judgment that analysis of the statutory language, taken in context, indicates that no affirmative right was contemplated and further that those cases that have permitted such a right are factually inapposite, we also believe it would be unwise to permit such suits as a matter of policy. As the dissenting justice in *Benton State Bank,* 562 S.W.2d 74, noted, allowing affirmative suits would "make every Banker, who has taken an assignment of accounts for security purposes, a deep pocket surety for every bankrupt contractor in the state to whom it had loaned money." *Id.* at 77 (Byrd, J., dissenting).

We are unwilling to impose such an obligation on the banks of the Commonwealth without some indication that this represents a considered policy choice. By making the bank a surety, not only will accounts receivable financing be discouraged, but transaction costs will undoubtedly increase for everyone. The case at hand provides a good example. In order to protect themselves, FNB would essentially be forced to undertake the precautionary measures that Michelin attempted to use, independent observation by an intermediary and sworn certifications by the assignor. FNB would have to supervise every construction site where its funds were involved to ensure performance and payment. We simply do not believe that the banks are best suited to monitor contract compliance. The party most interested in adequate performance would be the other contracting party, not the financier. Given this natural interest, it seems likely to us that while the banks will be given additional burdens of supervision, there would be no corresponding re-

duction in vigilance by the contracting parties, thus creating two inspections where there was formerly one. Costs for everyone thus increase, without any discernible benefit. It is also difficult to predict the full impact a contrary decision would have on the availability of accounts receivable financing in general.

Our holding, of course, is not that § 9–318 *prohibits* claims against the assignee. We hold merely that § 9–318 concerns only the preservation of defenses to the assignee's claims and, as such, is wholly inapposite in an affirmative suit against an assignee.

## II.

The Restatement of Restitution, § 28(d) (1937), states:

§ 28. Mistake Due to Fraud or Misrepresentation.

A person who has paid money to another because of a mistake of fact and who does not obtain what he expected in return is entitled to restitution from the other if the mistake was induced:

\* \* \* \* \* \*

(d) By the fraud or material misrepresentation of a third person, provided that the payee has notice of the fraud or representation before he has given or promised something of value.

For cases where the mistake was not due to fraud, substantially the same rule is stated in § 14 of the Restatement:[3]

§ 14. Discharge for Value.

(1) A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

(2) An assignee of a non-negotiable chose in action who, having paid value therefor, has received payment from the obligor is under no duty to make restitution although the obligor had a defense thereto, if the transferee made no misrepresentation and did not have notice of the defense.

■ The Supreme Judicial Court of Massachusetts has followed the Restatement in denying restitution against an assignee for value who is without notice of the assignor's fraud. The threshold question, therefore, is whether FNB, by reducing JCC's indebtedness on its outstanding loan, gave value for the funds it received from Michelin. We agree with the district court that value was given. In *Merchants' Insurance Co. v. Abbott*, 131 Mass. 397 (1881), the plaintiff insurance company paid a claim for fire loss to the insured's assignee. A year later, the plaintiff discovered the fire was the result of the insured's arson and sought restitution from the assignee. Restitution was denied because the assignment was for value—the discharge of a debt— and because the assignee was "wholly innocent" of the insured's fraud. *Id.* at 400. *Cf. National Shawmut Bank v. Fidelity Mutual Life Insurance Co.*, 318 Mass. 142, 61 N.E.2d 18 (1945) (applying §§ 1 and 14 of the Restatement); *Old Colony Trust Co. v. Wood*, 321 Mass. 519, 527, 74 N.E.2d 141, 146 (1947) (consistent with, § 14 of the Restatement); *Rockland Trust Co. v. South Shore National Bank*, 366 Mass. 74, 79, 314 N.E.2d 438 (1974) (comparing contract law principle of voiding contract for fraud of third party with the similar rule of § 28(d) of the Restatement).

Having decided that FNB gave value, the crucial question becomes whether the defendant, assignee FNB, had notice of the fraudulent conduct of assignor JCC. We have found no Massachusetts cases directly addressing the standard to be applied in

---

**3.** The Restatement gives the following illustration:

A falsely represents to B that he has done work for him to the value of $100 and B gives to A a non-negotiable note for that amount. A assigns this note to C who pays value therefor and has no reason to know of A's fraud. B pays the amount of the note to C. B is not entitled to restitution from C. Restatement of Restitution, § 14 (1937).

determining whether a party has notice of fraud under the law of restitution. Under the analogous rule for voiding of a contract because of fraud, the Supreme Judicial Court held in *Rockland Trust* that a contract is voidable where a party has "reason to know" of the fraud before giving value or materially changing its position. 366 Mass. at 79, 314 N.E.2d at 441.

The "reason to know" standard has been incorporated into the general definition of notice as it is used in the UCC. Mass.Gen. Laws Ann. ch. 106, § 1–201(25) (West 1958) states in pertinent part:

A person has "notice" of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person "knows" or has "knowledge" of a fact when he has actual knowledge of it.

In *Bowling Green, Inc. v. State Street Bank & Trust Co.*, 425 F.2d 81 (1st Cir. 1970) we construed the Code's definition of notice under § 1–201(25). The plaintiff had sent a seller a check as payment for goods that the seller knew it would be unable to deliver. The seller deposited the check in the defendant bank, which applied it against the seller's debts. We held that the bank was a holder in due course, without notice of the seller's fraud under § 1–201(25). The bank, as one of the seller's three major creditors, knew of the seller's "poor financial health and of its inability to satisfy all its creditors" and knew that its checking account was overdrawn. The bank also charged a portion of the borrower's outstanding debt to its bad debt account. Further, the bank's loan officer for this account was also a corporate director of the debtor. *Id.* at 84. Despite this significant involvement by the bank, these facts did not amount to notice of the seller's fraud because the lender was not aware of the particular sale that led to the deposit. Moreover, the bank continued to make loans to the seller and did not know of its plans to file a petition in bankruptcy.

Since the language of § 1–201(19) (concerning good faith) and § 1–201(25) focuses on actual knowledge, we determined that Massachusetts had rejected the so-called "objective" standard that would deny holder in due course status to most financing of installment loans that have a close business relationship with the seller. *Id.* at 85. *Cf. Jones v. Approved Bancredit Corp.*, 256 A.2d 739 (Del.Supr.1969) (applying "objective" standard).

In *Morgan Guaranty Trust Co. v. Third National Bank*, 529 F.2d 1141 (1st Cir. 1976), we had occasion to determine whether the manner in which a bank had received information put it on notice under Mass. Gen.Laws Ann. § 1–201(27) (West Supp. 1981) that section reads:

Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting the transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

The defendant bank accepted treasury bills that had been stolen from the plaintiff as collateral for a loan. Although the bank officers involved were unaware of the bills' status, the bank had received a "notice of lost securities," which was on file at the bank, listing the bills as missing. We upheld the district court's conclusion that the bank had notice of the bills' status, since the information would have been communicated to the bank officers if the bank had

made a reasonable effort to inform its officers of the existence of its stolen securities file. 529 F.2d at 1143.

Although, as we discuss below, the present issue does not involve the UCC, we look to the statutory definition of notice under the UCC as adopted by the Massachusetts legislature, as well as to analogous case law, for guidance in determining the standard that would be applied by the Supreme Judicial Court of Massachusetts. In the absence of a definitive ruling by the highest state court, a federal court may consider "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand," taking into account the broad policies and trends so evinced. *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 663 (3d Cir. 1980). We believe that, under Massachusetts law, a person has notice of a fact when, from all the information at his disposal, he has reason to know of it. Organizations are chargeable with knowledge of information in their possession when reasonable communications routines would disseminate that information to the appropriate individuals.

Application of this standard requires a heavy reliance on the factual findings of the district court, which we must accept unless clearly erroneous. *See Bowling Green*, 425 F.2d at 85. We give the same deference to the trial court's findings in a case tried on a stipulation of facts as in any other case. *Holmes v. Bateson*, 583 F.2d 542, 552 (1st Cir. 1978).

The district court found that the bank, FNB, was aware of JCC's financial struggles well before it received the progress payments. The bank had recently informed JCC that loan funds were to be used only for payroll and taxes. Additionally, before it received the last payment, FNB had told JCC that its credit would be terminated in three months. FNB also knew of JCC's contractual duties, including its obligation to pay subcontractors.

Since FNB, the district court found, was unaware of the fraudulent Statutory Declarations that caused Michelin to make the disputed payments, FNB cannot be held to have had notice of JCC's fraud merely from its knowledge of JCC's finances. Although it was JCC's sole major lender, it was not nearly as involved as the bank in *Bowling Green*, which was also found to have no notice. Recovery under § 28 of the Restatement of Restitution is accordingly foreclosed.

Under § 14 of the Restatement, FNB would be liable to make restitution if it had notice of Michelin's defense or mistake before giving value for the payments—*i.e.*, if it had notice that the subcontractors had not been paid. While Michelin does not assert that any of FNB's officers actually knew, or that the bank had actually been informed that JCC was not paying its subcontractors, Michelin argues that FNB had constructive notice of this fact. In support of its argument, Michelin directs us to portions of the Stipulation of Facts purporting to establish that FNB was JCC's only source of funds at the time of the payments and that FNB knew JCC could not have paid its subcontractors because its loan funds had been restricted to use for payroll and taxes. The district court, however, did not find that JCC had no other sources of income, and it specifically found that the bank did nothing to enforce the restrictions on use of loan funds. The record supports these findings and the implication to be drawn from them that FNB did not have reason to know of JCC's failure to pay subcontractors.

If we were to hold FNB chargeable with notice of JCC's nonpayment of subcontractors on this record, we would be imposing an affirmative duty on lenders to look out for the interests of account debtors such as Michelin. In order for FNB to have discovered JCC's failure to pay its subcontractors, FNB would have had to initiate an investigation of JCC's business practices under the Michelin contract, not aimed at determining the company's financial health for purposes of the bank's continued financing, but aimed at verifying JCC's compliance with

the Michelin contract. That JCC was in monetary straits could not have indicated that subcontractors had gone unpaid without such an investigation. We are unwilling to impose such a responsibility on lenders.

Here, FNB did attempt to verify the accuracy of the copies of invoices it was receiving from JCC by contacting Michelin. Michelin's agent, SNC, responded that the invoices were "OK." Michelin's losses might have been avoided if it had required JCC to provide a performance bond or if it had availed itself of its right to visit the offices of subcontractors and investigate the progress of the work. It might have demanded more vigilance from its agent, SNC. SNC was on the site and was charged with supervising the job and certifying its progress. The one area where Michelin was most vulnerable to fraud—the Statutory Declarations—was the area that it could have checked very easily and where, unfortunately, it failed to check at all. It cannot shift its loss to the bank by arguing now that the bank should have monitored JCC's compliance when it failed to do so.

Affirmed.

BOWNES, Circuit Judge (dissenting).

I dissent from the majority's holding that Michelin does not have an independent cause of action against First National Bank of Boston (FNB). The pertinent portion of the Uniform Commercial Code as enacted in Massachusetts reads as follows:

*Defenses Against Assignee; Modification of Contract After Notification of Assignment; Term Prohibiting Assignment Ineffective; Identification and Proof of Assignment.* (1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9–206 the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor

and any defense or claim arising therefrom[.]

Mass.Gen.Laws Ann. ch. 106, § 9–318(1)(a).

Although the words "subject to" suggest that the limitations that follow are merely restrictions on the assignee's affirmative rights and are not affirmative rights themselves, the word "claim" suggests that the account debtor may assert affirmative rights of action against the assignee.

No Massachusetts court has ruled directly on this question. In *Fall River Trust Co. v. B. G. Browdy, Inc.*, 346 Mass. 614, 195 N.E.2d 63, 2 U.C.C.Rep.Serv. 1 (1964), however, the Massachusetts Supreme Judicial Court indicated that an account debtor could assert as a setoff the type of claim Michelin is seeking to assert affirmatively here. That case involved an attempt by the account debtor of a bankrupt business, in an action by the bankrupt's creditor and assignee of accounts against the account debtor for amounts due, to set off the amount of value of the account debtor's goods that the bankrupt had lost. The bankrupt was engaged in the finishing and dyeing business, and the account debtor had earlier delivered certain goods to him to be finished and dyed. Because of ambiguities in the record, the court remanded the case for further fact finding. The court said, however, that if the goods lost had been delivered pursuant to the accounts that the assignee was now suing on, the account debtor could, under section 9–318(1)(a), set off the value of the goods lost. The question in this case, then, is whether an account debtor's claims against the assignee for payments mistakenly made due to fraud are restricted to situations where they may be asserted in setoff or whether they may be asserted originally.

I believe that the sounder view is that an account debtor may sue the assignee directly under section 9–318(1)(a) for payments received under the assigned contract. This section provides that an assignee's rights are subject to claims and defenses that the account debtor had against the assignor. The Uniform Commercial Code, as enacted in Massachusetts does not define "claim,"

but the word "claim" is commonly understood to include original cause action. For example, when "claim" is used in the Massachusetts Rules of Civil Procedure (admittedly the rules quoted were effective only as of 1974), it includes original claims. *See* Mass.R.Civ.P. 8(a) ("[a] pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]"); Mass.R. Civ.P. 18(a) ("[a] party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third party claim, may join, either as independent or as alternate claims, as many claims, legal or equitable, or both, as he has against an opposing party.")

It is, in my opinion, incorrect to conclude that the words of limitation, "subject to," foreclose original claims. A party's rights can be subject to whatever affirmative claims or defenses another party might assert. Under section 9–318(1)(a), an assignee's rights to retain payments made to it under an assignment are subject to, or are exposed to, affirmative actions brought by the account debtor to recover payments mistakenly made. The definition of "subject to" taken by the court from *Englestein v. Mintz*, 345 Ill. 48, 61, 177 N.E. 746, 752 (1931), and *Anderson v. Southwest Savings & Loan Association*, 117 Ariz. 246, 248, 571 P.2d 1042, 1044 (1977), is too broad. The "affirmative rights" denied to the plaintiffs in those cases were open-ended rights, that is, the plaintiffs were seeking amounts in excess of and unrelated to amounts provided for under the original contracts. In *Englestein*, plaintiff asserted that because his partnership agreement with defendant to purchase part of a parcel of real estate was "subject to" the terms of an earlier contract defendant had with the vendor of the real estate, he was entitled to share as a partner in other purchase transactions defendant had with respect to the parcel. The court rejected the claim, in part on the basis of its definition of "subject to." In *Anderson*, plaintiff sued for breach of implied warranties in the sale of a mobile home, naming as defendants the vendor,

the manufacturer, and the vendor's secured creditor. The Arizona court affirmed dismissal of the suit against the secured creditor, reasoning that "subject to" in section 9–318(1)(a) did not expose a secured creditor to such claims against the creditor's assignor. These cases do not reject the result I support, that payments received by an assignee of accounts (FNB) are subject to a claim by an account debtor (Michelin) that payments were mistakenly made because of fraud by the assignor (JCC).

This interpretation of section 9–318(1)(a), that the account debtor has rights of action against the assignee, is the fairest way to reconcile the rights of account debtors and secured creditors, particularly where, as here, credit is advanced through a line of credit. This case boils down to the question of whether the secured creditor or the account debtor should bear the cost of not finding out that JCC falsely claimed that it had paid its subcontractors. The secured creditor is in a better position than the account debtor to determine whether the assignor/borrower is complying with the terms of the contract in which the creditor has an interest. The reason is that the secured creditor can employ an effective sanction without having to initiate litigation and without risking any loss itself to ensure compliance; it can threaten to cut off credit unless it is satisfied with the borrower's performance. The other party, the account debtor, has no similar sanction. If he is not satisfied, he must litigate and bear the expense of litigation and the sure delay in completion of the contract. The creditor/assignee is not deterred from enforcing compliance by such costs. Obviously, either the secured creditor or the account debtor can make inquiries regarding compliance with the contract, but at some point both will have to rely on the representations of others, which creates opportunities for fraud, as occurred here. The secured creditor is accustomed to looking over the borrower's shoulder on an ongoing basis and can check compliance. By virtue of his control over credit, the creditor can ensure compliance with the contract.

The account debtor can only investigate and if it holds up payments, it puts the contract in jeopardy.

The majority contends that holding for appellants will disrupt the free flow of credit because creditors will have additional duties. This argument goes too far because it counsels against any imposition on creditors. Besides, whatever increased credit costs arise will fall on the class truly at fault in these cases—the borrower/assignors.

The majority also stresses the concern that actions under section 9–318(1)(a) will make creditors fully liable for the contracts of their borrowers, which would contravene section 9–317.[1] This case does not present this problem, and this result need not occur. I do not argue that the creditor should be the surety for the assignor. The creditor should be exposed only to the extent that he benefits from the assigned contract rights. Tracking the language of section 9–318(1)(a), whatever rights of payment a secured creditor has are subject to the terms of the contract between the account debtor and the borrower/assignor. The account debtor cannot go beyond the benefits the creditor/assignee obtains under the assignment in an action against the creditor. Whether the account debtor asserts the claim as a counterclaim or as an original claim should be irrelevant.

In reaching a contrary conclusion, the court has relied on the Official Comment to section 9–318 to clarify the supposed conflict between "claim" and "subject to."

This reliance is misplaced because the Comment is at least as ambiguous as the language of section 9–318(1)(a) itself.[2] The relevant portion of the Comment reads, "[s]ubsection (1) makes no substantial change in prior law." The argument that the provision for an original right of action in section 9–318(1)(a) would not change prior law substantially is at least as plausible as the majority's argument that it would make a substantial change.

The prior law in Massachusetts was that an account debtor could assert "all defences and rights of counter-claim, recoupment or set-off" against the creditor/assignee when the creditor/assignee sued him on the account. Mass.Gen.Laws Ann. ch. 231, § 5 (repealed 1975). This statute had primarily a procedural purpose: an assignee was enabled for the first time to sue in his own name rather than in the assignor's, and, accordingly, an account debtor was permitted to assert defensive rights directly against the assignee when he sued. *Quality Finance Co. v. Hurley*, 337 Mass. 150, 155, 148 N.E.2d 385, 389 (1958). It seems reasonable to suppose that the question of affirmative rights for account debtors was simply not contemplated.[3] Section 9–318(1)(a) now speaks more broadly than did ch. 231, § 5: the account debtor's rights against the assignee are not restricted explicitly to defensive claims. Thus, the Massachusetts legislature quite conceivably could have decided to give account debtors an affirmative right, and this would not have represented a substantial change in

1. Mass.Gen.Laws Ann. ch. 106, § 9–317 provides as follows:

*Secured Party Not Obligated on Contract of Debtor.* The mere existence of a security interest or authority given to the debtor to dispose of or use collateral does not impose contract or tort liability upon the secured party for the debtor's acts or omissions.

2. I would also point out that the Official Comments have not been enacted as part of the UCC in Massachusetts. Furthermore, in some states the comments were not placed before the legislatures when they considered the UCC, and the comments occasionally expand on or retract from enacted sections of the Code. J. White & R. Summers, Handbook of the Law

Under the Uniform Commercial Code § 4, at 12–13 (1972).

3. *Wright v. Graustein*, 248 Mass. 205, 142 N.E. 797 (1924) is not to the contrary. The "sole question" at issue in that case was whether the account debtor could set off damages for breach of contract caused by plaintiff not only against the claim that plaintiff had against him directly but also against claims against the account debtor that had been assigned to the plaintiff and that were sued on in the same action. The Supreme Judicial Court held that he could not. 142 N.E. at 799. The question here of the effect of the assignor's delinquencies on the relative rights of the account debtor and assignee was not addressed.

the law. Putting the point more strongly, given the plainly broader language of section 9–318(1)(a), it seems curious to turn to what is effectively the legislative history of the section in order to give it the same apparent meaning as the old statute.

I agree with the majority that the decisions from other jurisdictions are not illuminating. I cannot agree, however, with its suggestion that the decisions allowing the account debtor to sue originally are founded on an exception to section 9–318(1)(a) that is based on the common law of restitution. These decisions mark a hazy line if one is seeking to identify an exception to the rule that original rights of action by account debtors are not allowed. The element these cases do share is emphasis on some degree of participation by the assignee in the contract between the assignor and the account debtor. *See Benton State Bank v. Warren*, 263 Ark. 1, 562 S.W.2d 74 (1978); *Farmers Acceptance Corp. v. DeLozier*, 178 Colo. 291, 496 P.2d 1016 (1972); *Massey-Ferguson Credit Corp. v. Brown*, 173 Mont. 253, 567 P.2d 440 (1977). The function of the "participation" requirement is unclear. In *Benton State Bank*, the participation seems most clearly to mean that the assignee had notice of the terms of the contract between the assignor and the account debtor and so received payments subject to any actions for breach of contract.[4] The court in *Benton State Bank* also balanced the negligence of both the account debtor and the assignee in not enforcing compliance with the contract to determine whether the assignee should be held liable. The *Massey-Ferguson* court emphasized participation by the assignee much more strongly, apparently on the unarticulated theory that the assignee could be sued as a sort of cocontractor or surety. The critical point for the court was that the assignee had orally affirmed the assignor's promises. *DeLozier* falls somewhere in the middle: the assignee's partici-

pation was greater than the assignee's in *Benton State Bank* and less than the assignee's in *Massey-Ferguson*. The *DeLozier* court seemed to follow the *Benton State Bank* notice theory.

As to contrary cases, Minnesota has held that an account debtor does not have a right of action under section 9–318(1)(a) a decision with which, of course, I do not agree. *Meyers v. Postal Finance Co.*, 287 N.W.2d 614 (Minn.1979). A lower New York court has also appeared to hold similarly, *James Talcott, Inc. v. Brewster Sales Corp.*, 16 U.C.C.Rep.Serv. 1165 (N.Y.Sup.Ct. 1975), but in that case the court emphasized that the assignor was still solvent and could be sued and that because the account debtor's guarantor had paid an earlier judgment to the assignee in an action arising out of the same accounts, the account debtor was trying to get a refund of money it had not paid.

When these cases are applied to the instant case, FNB seems to be exposed to liability as an assignee with notice. The notice required in *Benton State Bank* and *DeLozier* is only notice of the terms of the contract, not notice of the breach. As in *Benton State Bank*, FNB was in a better position to detect or prevent breaches than Michelin. I do not rest my dissent, however, on an assignee-with-notice rule. An account debtor should be able to sue without proving notice; it is only realistic to assume that a creditor taking a security interest in accounts will acquaint himself with their terms.

For the foregoing reasons, I would hold that Michelin has a direct cause of action against FNB for the monies it received from Michelin under its assignment from JCC.

---

**4.** This characterization of *Benton State Bank* is different than the majority's in that I do not believe that the fact that the bank passed along the assignor's assertions of compliance to the account debtor is particularly significant. The crucial aspect of *Benton State Bank* was the

existence of "solid reasons" for doubting that the assignor was fulfilling its contractual obligations. Thus *Benton State Bank* is not so much different than this case, where FNB also had solid reasons for doubting JCC's performance.