**PHIL GREER & ASSOCIATES, INC.**

v.

**CONTINENTAL BANK**

v.

**NRG ENTERPRISES, INC. and Jerome J. Kerwin.**

**Civ. A. No. 82–2654.**

United States District Court, E.D. Pennsylvania.

July 29, 1985.

Howard J. Kaufman, Christine Fritton, Philadelphia, Pa., for plaintiff.

Alan C. Gershenson, Philadelphia, Pa., for Continental Bank.

Kenneth M. O'Brien, Roger D. Susanin, King of Prussia, Pa., for NRG Enterprises, Inc. and Jerome J. Kerwin.

MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court are cross-motions for summary judgment. For the reasons stated herein, defendant's motion will be granted and plaintiff's motion will be denied.

FACTS

In December 1981, and January 1982, plaintiff agreed to purchase pipe valued at $300,000.00 from Transcontinental Casing, Inc. ("Transcontinental").[1] Transcontinental expressly and impliedly warranted that

---

**1.** Transcontinental purchased the pipe in this case from NRG Enterprises, Inc. on credit, and

Transcontinental, in turn, sold the pipe to plaintiff.

the pipe would meet quality standards promulgated by the American Petroleum Institute, or, in other words, it was free of defects, was of merchantable quality, and was fit for the particular purpose intended.

After the contract between Transcontinental and plaintiff was executed, Transcontinental and Lincoln Bank ("bank"),[2] on February 19, 1982, entered into an accounts receivable financing arrangement. This arrangement was negotiated on behalf of Transcontinental by Paul Murray, President of NRG Enterprises, Inc. ("NRG"), and Jerome J. Kerwin, an officer and 50% shareholder of Transcontinental[3] and the sole shareholder of NRG. A. Gerard Cunningham, a Senior Vice-President of the bank, acted on behalf of the assignee bank.

On February 19, 1982, the bank placed the loan proceeds of $267,709.90 in a Certificate of Deposit ("CD") in the name of NRG. As additional security Transcontinental assigned the two Transcontinental invoices for the sale of the pipe to plaintiff.[4] The bank was required to release the loan proceeds from the CD to Transcontinental as plaintiff made the payments on the invoices.[5]

Throughout the period of its relationship with Transcontinental, the bank has been a creditor with loans fully collateralized by CD's. The bank did not investigate the creditworthiness of Transcontinental, NRG, or the companies' principals, nor did the bank or its agents inspect the quality of the pipe sold by Transcontinental. Moreover, the bank never became involved in any way with the management of or decision-making process at Transcontinental.

After each invoice was assigned to the bank, the bank notified plaintiff of the assignment and of plaintiff's legal obligation to pay the amounts of the invoices to the bank. So notified, plaintiff paid the bank $174,423.23.[6]

The pipe ultimately proved to be seriously defective and virtually worthless. Plaintiff did not discover the defect prior to making the payments to the bank because the defect was not visible to the naked eye and electronic inspection had not yet been completed.[7]

Since the pipe was virtually worthless, plaintiff sued the bank to recover the funds which plaintiff paid to the bank. Plaintiff's theories of recovery are as follows: (1) Title 13 Pa.Cons.Stat.Ann. § 9318(a) provides that an assignee's rights are "subject to ... any ... claim" arising from the contract between the assignor and account debtor. Plaintiff argues that an account debtor can, therefore, assert any affirmative claims which it has against the assignor against the assignee. In this case, plaintiff asserts that it is entitled to recover payments made to the bank where the goods sold by Transcontinental are defec-

---

**2.** Defendant is Lincoln Bank's successor in interest.

**3.** The other 50% of Transcontinental was owned by Richard A. Sparks.

**4.** Apparently, a third invoice came to be assigned to the bank. The date of that assignment has not been specified by the parties. Presumably, the financial arrangement was the same as that concerning the first two invoices.

**5.** The financial package was virtually risk-free to the bank. In retrospect, from the bank's point of view, the structure of the loan was sound because the bank held cash collateral rather than security positions on Transcontinental's two assets: its inventory and $373,927.00 accounts receivable. The inventory was the pipe which is now alleged to be defective. At the time of the loan to the present, NRG held a prior security interest in the pipe. Transcontinental's accounts receivable was created by the sale of the pipe.

At the time of the loan, Cunningham, assessing the structure of the financial package, considered also that Transcontinental was incorporated in October 1981, only five months prior to the funding of the loan, that it had virtually no cash, and that its total paid-in capital was $50,000.00.

**6.** Of this $174,423.23 amount, $32,376.31 was first paid by plaintiff directly to Transcontinental which endorsed the check over to the bank. The remaining amount was paid by plaintiff directly to the bank.

**7.** For purposes of this opinion, the court assumes that the defect in the pipe was latent and could not be discovered without extensive and lengthy tests.

tive (plaintiff's "statutory theory"); and (2) under Pennsylvania law, plaintiff has a claim of restitution.

Both plaintiff and the bank move for summary judgment.[8]

DISCUSSION

### 1. *Plaintiff's 13 Pa.Cons.Stat.Ann. § 9318(a) Theory*

Title 13 Pa.Cons.Stat.Ann. § 9318(a) provides:

Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9206 (relating to agreement not to assert defenses against assignee) the rights of an assignee are subject to:

(1) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

■ Construction of the language "subject to ... any ... claim arising therefrom" under Pennsylvania law is the key to the analysis of plaintiff's statutory theory. Briefly stated, if this court finds that the Pennsylvania Supreme Court would interpret the statutory language to allow an account debtor to assert affirmative claims against an assignee, defendant's motion will be denied. On the other hand, if Pennsylvania law would not permit an account debtor to assert affirmative claims against an assignee, defendant's motion will be granted.

The court believes that the place to start the analysis is the Uniform Commercial Code, Comment-1972, No. 1, which states:

Subsection (1) makes no substantial change in prior law. An assignee has traditionally been subject to defenses or set-offs existing before an account debtor is notified of the assignment. When the account debtor's defenses on an assigned claim arise from the contract between him and the assignor, it makes no difference whether the breach giving rise to the defense occurs before or after the account debtor is notified of the assignment (paragraph (1)(a)). The account debtor may also have claims against the assignor which arise independently of that contract: an assignee is subject to all such claims which accrue before, and free of all those which accrue after, the account debtor is notified (paragraph (1)(b)). The account debtor may waive his right to assert claims or defenses against an assignee to the extent provided in Section 9–206.

With this in mind, the court turns to the question of whether the Pennsylvania Supreme Court would permit, either before or after Pennsylvania enacted the UCC, the account debtor to sue affirmatively the assignee to recover proceeds paid to the assignee, who was rightly entitled to recover those proceeds, when the goods supplied by the assignor to the account debtor were defective. The parties do not direct the court's attention to, and the court in its own research does not find, any Pennsylvania Supreme Court cases enunciating the Pennsylvania rule. The Court of Common Pleas of Philadelphia County, however, considered a related issue in *K Mart Corp. v. First Pennsylvania Bank*, 16 Pa. D & C3d 509 (C.P.Phila.1980). In *K Mart*, plaintiff buyer ("account debtor") always paid its supplier's assignee the full purchase price on shipments over an eight year period and always deducted credits from later payments on subsequent shipments when it discovered defects in the prior shipment's merchandise. The *K Mart* court permitted the account debtor to seek to recover payments made for goods which it later found to be defective, because there was a prior understanding between the assignee and the account debtor that the assignee was

---

**8.** Fed.R.Civ.P. 56 provides, in pertinent part: The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

not entitled to payment of or to retain "funds which should not have been paid to it initially." *Id.* at 517.

*K Mart* is not controlling in the instant case. The prior understanding in *K Mart* that the account debtor was entitled to all the proceeds paid initially to the assignee is not present in the present case. On the contrary, the parties do not dispute that the bank was entitled to receive the funds paid to it initially.

The Restatement (Second) of Contracts § 336 and certain of its Comments provide the court with instruction and the basis for a prediction that the Pennsylvania Supreme Court would follow the Restatement rule. The Restatement provides, in relevant part:

> The right of an assignee is subject to any defense or claim of the obligor which accrues before the obligor receives notification of the assignment, but not to defenses or claims which accrue thereafter except as stated in this Section or as provided by statute.

Restatement (Second) of Contracts § 336(2)(1.974), Comment C, interprets the phrase "claim of the obligor" as follows:

> c. Accrued claims. Statutes or rules of court commonly permit an obligor when sued to assert by way of set-off or counterclaim in the same action such claims as he has against the plaintiff, whether related to the plaintiff's claim or not. See, e.g., Rule 13 of the Federal Rules of Civil Procedure. In appropriate circumstances the obligor may use defensively against an assignee an offsetting claim against the assignor, although the assignee is not subject to affirmative liability on such a claim unless he contracts to assume such liability. See § 328; Uniform Commercial Code §§ 2–210, 9–317.

  •    •    •    •    •

Set-off against an assignee has sometimes been limited to cases where both offsetting claims were fully matured at the time of assignment. The modern rule, however, unless a statute provides otherwise, turns on the time the obligor receives notification of assignment and applies even though the assigned right has not then matured. See Uniform Commercial Code § 9–318.

Restatement (Second) of Contracts, § 336, Comment C (1979).

The court believes that the Restatement rule, which does not permit an account debtor with adequate notice of the assignment to make an affirmative claim against the assignee, is founded on sound public policy considerations. Those considerations were set forth by the United States Court of Appeals for the First Circuit in *Michelin Tires (Canada) Ltd. v. First National Bank of Boston,* 666 F.2d 673 (1st Cir.1981),[9] which was decided under Massachusetts law.

> We are unwilling to impose such an obligation on the banks of the Commonwealth without some indication that this represents a considered policy choice. By making the bank a surety, not only will accounts receivable financing be discouraged, but transaction costs will undoubtedly increase for everyone.

  •    •    •    •    •

> We simply do not believe that the banks are best suited to monitor contract compliance. The party most interested in adequate performance would be the other contracting party, not the financier. Given this natural interest, it seems likely to us that while the banks will be given additional burdens of supervision, there would be no corresponding reduction in vigilance by the contracting parties, thus creating two inspections where there was formerly one. Costs for everyone thus increase, without any discernible benefit. It is also difficult to

---

**9.** Plaintiff tries to distinguish *Michelin Tires* on the ground that the assignee in *Michelin Tires* maintained an assignment of all of the seller's accounts receivable and contract rights for approximately 20 years and the bank, in the present case, was assigned only three invoices.

This distinction is without merit. The court does not believe that a bank whose loan is fully secured should be saddled with the legal obligation to inspect the product identified under even three invoices and delivered to a merchant.

predict the full impact a contrary decision would have on the availability of accounts receivable financing in general. *Id.* at 679–680. In the instant case the same rationale supports the conclusion that the Restatement rule is a better rule and the one that the Pennsylvania Supreme Court would adopt. It is obvious that a creditor, providing financial support to many commercial borrowers in a vast variety of industries, should not be legally obligated or reasonably expected to inspect all of the goods delivered by its borrowers to their customers. It is difficult to perceive how such a responsibility could be carried out without making the bank a party to the manufacturing and selling function. Such an obligation would be an unrealistic burden on commerce in the Commonwealth of Pennsylvania as well as outside the Commonwealth regarding interstate transactions. Such a burden also includes the consequent difficulty or even unavailability of credit and surely extraordinary cost increases. Credit would be much harder to receive and more expensive.

The Commonwealth's financial system would be equally burdened if the bank was obligated to make a thorough investigation of the financial well-being of all of its assignors and to notify all of its account debtors. First, the court does not believe that Pennsylvania, enacting the UCC, intended the inconsistent situation that; where an assignment occurred, the seller's assignee should be obligated to investigate the creditworthiness of its assignor on behalf of the buyer-account debtor, but where no assignment occurred, the buyer should be obligated to determine the creditworthiness of the seller. Additionally, the court does not believe that 13 Pa.Cons.Stat.Ann. § 9318(a) is intended to allow the buyer for no additional consideration to secure an additional unexpected source to recover from in the event the debtor's arrangement with the party he contracted with does not work out. Moreover, the court believes that it is inappropriate to permit the buyer-account debtor to recover from the seller's assignee when the account debtor had the opportunity to consider some special arrangement to protect itself such as that in the *K Mart* case. For these reasons, the court believes that the rule proposed by plaintiff would unreasonably burden the financial system and commerce in Pennsylvania.

Accordingly, the court finds that the Pennsylvania Supreme Court probably would adopt the Restatement rule. Consequently, defendant's motion for summary judgment on plaintiff's statutory claim will be granted.

### 2. Plaintiff's Restitution Theory

The court predicts that the Supreme Court of Pennsylvania, having adopted Restatement of Restitution, § 14(1) (1937) in *Commonwealth of Pennsylvania Department of General Services v. Collingdale Millwork Company,* 71 Pa.Commw. 286, 454 A.2d 1176 (Pa.Commw.Ct.1983), would also adopt the following subsection, Restatement of Restitution, § 14(2) (1937). That section reads as follows:

An assignee of a non-negotiable chose in action who, having paid value therefor, has received payment from the obligor is under no duty to make restitution although the obligor had a defense thereto, if the transferee made no misrepresentation and did not have notice of the defense.

Restatement of Restitution, § 14(2) (1937).

Applying this rule to the present case, the court holds: (1) that the bank paid value for the assignment; (2) that the bank received, as it was entitled to receive, payments from plaintiff; (3) that the bank made no misrepresentation; and (4) that the bank did not have notice of the defective nature of the pipe.

In accord with this holding is the following illustration from the Restatement of Restitution:

A falsely represents to B that he has done work for him to the value of $100 and B gives to A a non-negotiable note for that amount. A assigns the note to C who pays value therefor and has no reason to know of A's fraud. B pays the

**428**

amount of the note to C. B is not entitled to restitution from C.

Restatement of Restitution, § 14 (1937). Also in accord with this holding is *Michelin Tires, supra.*

Consequently, plaintiff's restitution theory cannot withstand the bank's motion for summary judgment.

CONCLUSION

Accordingly, the bank's motion for summary judgment will be granted. Plaintiff's motion for summary judgment will be denied.