# BENTON STATE BANK *v.* Frank R. WARREN and wife

77-22                                    562 S.W. 2d 74

Opinion delivered March 6, 1978
(In Banc)

*Hall, Tucker, Lovell & Alsobrook,* by: *O. Wendell Hall, Jr.,* for appellant.

*Owens, McHaney & McHaney,* by: *John C. Calhoun, Jr.,* for appellees.

GEORGE ROSE SMITH, Justice. The appellees, the Warrens, are engaged in building and operating apartments in California and elsewhere in the United States. In 1974 the Warrens, as owners and general contractors, began the construction of a 111-unit apartment complex at 2000 Reservoir Road in Little Rock. Four separate sub-contracts — for concrete work, rough carpentry, finish carpentry, and heating and air conditioning — were let to Harps General Contractors.

Harps failed to pay its suppliers of labor and materials, even though adequate progress payments were made from time to time by the Warrens. Those progress payments were made by checks payable jointly to Harps and to the appellant, Benton State Bank, which had lent money to Harps and had taken an assignment of Harps's right to

receive progress payments. Eventually the Warrens had to take over and complete Harps's four subcontracts. Various unpaid materialmen brought this suit against Harps and the Warrens, asserting liens against the apartment property. The Warrens cross-complained against Harps and the bank for any loss that the Warrens might ultimately sustain. That loss proved to be $13,367.12, for which the chancellor entered judgment in favor of the Warrens against Harps and the bank. The bank appeals. The sole question is whether the loss should be borne by the bank or by the Warrens. As we view the case, that question in turn depends upon which was more seriously at fault in allowing the loss to occur, both being at fault to some degree.

The facts, though undisputed, are not simple. The subcontract between Harps and the Warrens for rough carpentry is typical of the four subcontracts. The agreement provides that the Warrens will pay Harps $55,080 for its performance of the subcontract. On the tenth of each month the Warrens will make a progress payment to Harps for 90% of the work done in the preceding month. If there are unpaid suppliers of labor and materials the Warrens at their option may make the progress-payment checks payable jointly to Harps and to the suppliers. The contract also provides that Harps's right to compensation under the contract is assignable. Any assignment is subject to the Warrens' rights against Harps.

Shortly before construction began, the bank made a $60,000 loan to Harps to pay a tax delinquency owed by Harps, secured by a lien on some cattle. Later on Harps, as additional security, assigned to the bank its right to the progress payments under its subcontracts with the Warrens.

The president of the bank testified that the bank agreed to make additional loans to Harps of up to 75% of the amount due upon each application by Harps for a progress payment. In practice, the matter was handled in this way: Harps signed a printed form of application for each progress payment. The form set out the amount due and requested payment of 90% of that amount. Harps certified on each form that all bills for labor and materials covered by earlier progress payments had been paid. Those certifications were false. Harps was delinquent all along in the payment of its out-

standing accounts, as the bank had reason to know even if it did not have actual knowledge.

Whenever Harps submitted an application for a progress payment to the bank, the bank would advance money to Harps, as it had agreed to do. The bank president testified that he understood generally that the advances were to be used by Harps to meet its payroll. The bank sent each progress-payment application to the Warrens, with a covering letter like this one: "Enclosed is a copy of [Harps's] Application for Payment . . ., which has been assigned to us. Please make your check payable to Benton State Bank, as per our agreement with Harp's Construction Company, and sign [an acceptance of the assignment] in the space provided at the bottom of this page, and return the original to us."

The Warrens, upon the receipt at their California office of each application for a progress payment, would send their check for the requested amount to the bank. The checks were payable jointly to Harps and to the bank and bore this statement above the payee's endorsement: "By endorsement of this check payee acknowledges payment for labor, materials, or both, in construction at the following address: 2000 Reservoir Road, Little Rock, Ark." Such progress-payment checks totaled $82,686.24. Of that amount the bank used $27,271.86 to repay itself for loans on the Warren project, used $9,393.42 to repay itself for other loans, and deposited the balance of $46,020.96 to Harps's general account at the bank.

The procedure that we have outlined was followed by the parties for several months. Finally, however, a representative of one of the unpaid materialmen visited the Warrens' superintendent at the project site and expressed concern about getting money that was overdue from Harps for materials delivered to the job. The Warrens at once made an investigation and learned that Harps was delinquent in its indebtedness to its suppliers and was unable to demonstrate its solvency. The Warrens then took over the responsibility for completing the work, and this suit followed.

In our study of the case we have been assisted not only by the briefs of opposing counsel but also by a brief, submitted at our request, by counsel for the Permanent Editorial Board for the Uniform Commercial Code.

The case falls within the general purview of the Code, which applies by its terms to any transaction which is intended to create a security interest in accounts. Ark. Stat. Ann. § 85-9-102(1) (Supp. 1977). Harps's right to progress payments from the Warrens was an "account" as that term is defined in § 85-9-106. The Warrens were "account debtors" with respect to that account. § 85-9-105. Hence Harps was the assignor of an account, and the bank the assignee, as a result of Harps's assignment to the bank of its right to progress payments.

Section 85-9-318 (1) (a) provides that the rights of an assignee (the bank) are subject to all the terms of the contract between the account debtor (the Warrens) and the assignor (Harps) and to any defense or claim arising therefrom. It follows that the bank necessarily took some risk in lending Harps up to 75% of the amount specified in each application for a progress payment. That is, if the Warrens, upon receipt of an application, had discovered that there were outstanding bills for labor and materials, the Warrens, under the subcontract, could have made their check payable jointly to the bank and to the suppliers of labor and materials. In that situation it cannot be doubted that the bank's interest in the check would have been subordinate to the suppliers' primary right to payment. That is so because the bank's rights as assignee were subject to any claim by the Warrens against the bank's assignor, Harps, who was primarily liable to its own suppliers.

That, however, is not what happened. Instead the Warrens, with no knowledge of Harps's indebtedness to its suppliers, made their checks payable to Harps and to the bank. The bank cashed the checks and applied part of the money to its own loans to Harps. The narrow question is: In that situation, are the Warrens entitled to recover from the bank their payments up to the amount of their net loss, $13,367.12?

This precise question seems to have been considered in only one case, *Farmers Acceptance Corporation* v. *DeLozier*, 178 Colo. 291, 496 P. 2d 1016, 10 UCC Rep. 1099 (1972). That case was nearly identical to this one, in that a subcontractor had assigned his contract rights to a lender, the general con-

tractor had made a progress payment to that lender, and the general contractor then sought to recover its payment when it sustained a loss as a result of the subcontractor's failure to pay its suppliers. In holding that the general contractor was entitled to recover the amount that the lender had applied to its own loan to the subcontractor, the court relied upon Code provisions that we have mentioned and upon this sentence in a law review article by Professor Grant Gilmore: "[W]here the assignor fails to perform the contract, the assignee cannot retain mistaken, or even negligent, payments made to it by the [debtor] unless there has been a subsequent change of position by the assignee." Gilmore, The Assignee of Contract Rights and His Precarious Security, 74 Yale L.J. 217, 235, n. 35 (1964-65).

We need not say whether we would agree with Gilmore's statement in every case, no matter how negligent the account debtor might be or how innocent of fault the assignee might be. The issue is open to some exercise of judgment, for the precise point is not covered by any specific provision in the Uniform Commercial Code. In fact, Gilmore's sentence is, in context, merely his summary of the holding in *Firestone Tire & Rubber Co.* v. *Central Nat. Bank*, 159 Ohio St. 423, 112 N.E. 2d 636 (1953), a pre-Code case.

In the case at bar the equities clearly do not stand entirely in favor of either party. No doubt the Warrens were remiss in making no apparent effort to verify Harps's representations that all previous bills for labor and materials had been paid. On the other hand, the bank was certainly not an innocent recipient of the progress payments, without notice of possible claims on the part of the Warrens against Harps.

The bank knew that Harps had been compelled to borrow a large sum to pay delinquent federal taxes. It knew that another bank had refused to make that loan. It was in close touch with Harps's financial difficulties and knew, for instance, that shortly before the last progress payment was made at least eleven checks written by Harps on the bank had been dishonored. It had solid reasons for suspecting the truth of Harps's assertions, which the bank forwarded to the Warrens, that all past-due bills for labor and materials had been paid. It was on notice that its endorsements on the

progress-payment checks recited that the money was furnished to pay for labor and materials. The president of the bank, a law school graduate, knew that unpaid laborers and materialmen could file liens against the project. He knew that part of the earlier progress payments had been applied by the bank to its own loans to Harps and assumed that additional progress-payment money had been used by Harps to meet its payrolls. The question would naturally arise, How had Harps been able to pay its suppliers when it had to borrow against the progress payments to meet its payrolls? When all the circumstances are considered, we cannot say that the chancellor's decision in favor of the Warrens is clearly against the preponderance of the evidence.

Affirmed.

BYRD, J., dissents.

CONLEY BYRD, Justice, dissenting. The provisions of the Uniform Commercial Code, so far as here applicable provide:

> "Ark. Stat. Ann. § 85-9-318 (Supp. 1977) (1) '. . . the rights of an assignee are subject to (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; . . . ' "

The term "rights" is defined, Ark. Stat. Ann. § 85-1-201 (Supp. 1977) as follows:

> "(36) 'Rights' includes remedies."

Thus when we look at Ark. Stat. Ann. § 85-9-318, *supra,* with the definition of "rights" superimposed, we then read it as saying ". . . the [remedies] of an assignee are subject to (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; . . . "

Notwithstanding the specific language of the Uniform Commercial Code and its specific definitions, the majority has now interpreted Ark. Stat. Ann. § 85-9-318 to place a *liability* upon the assignee. The Benton State Bank was not pursuing a remedy as to the accounts in question from which the Warrens could make any defense or claim arising from

the pursuit of such remedy. The bank had no need to pursue a right (remedy) against the account debtor because all such accounts had been paid — in fact the bank was no longer an assignee as to those accounts.

The effect of the majority's view is to make every Banker, who has taken an assignment of accounts for security purposes, a deep pocket surety for every bankrupt contractor in the state to whom it has loaned money. Will the majority apply the same reasoning to product liability arising from such transactions under the innumerable warranty provisions? If so, what limitations will be applied to the bank's liability in such situations?

I also disagree with the majority that the bank had such notice of the unpaid bills that it was not a bona fide purchaser of the accounts.

For the reasons herein stated, I respectfully dissent.