GOLD CIRCLE STORES, A DIVISION OF FEDERATED DEPARTMENT STORES, INC., Plaintiff,

v.

RIVIERA FINANCE–EAST BAY, INC., Defendant and Third-Party Plaintiff,

v.

KESHUN'S FREIGHT SERVICE, a California partnership, Third-Party Defendant.

No. C–80–0373 AJZ.

United States District Court, N. D. California.

March 2, 1982.

Murphy, Weir & Butler, William J. A. Weir, Robert A. Julian, San Francisco, Cal., for defendant and third-party plaintiff Riviera Finance-East Bay.

Dinkelspiel & Dinkelspiel, Linda E. Stanley, Jay P. Wertheim, San Francisco, Cal., for plaintiff.

## MEMORANDUM OPINION AND ORDER

ZIRPOLI, District Judge.

This is a diversity action for money had and received, for imposition of a constructive trust, and for declaratory relief. Because the amount in controversy, exclusive of interest and costs, exceeds $10,000, this court has jurisdiction over the controversy pursuant to the provisions of 28 U.S.C. section 1332.

Gold Circle Stores ("Gold Circle") and Riviera Finance-East Bay, Inc. ("Riviera") were defrauded in 1979 by Keshun's Freight System ("Keshun"), a carrier hired by Gold Circle to transport merchandise in the State of California.

Although it could issue only one freight bill for each original Gold Circle bill of lading, Keshun rendered numerous invoices, separately numbered for each shipment. Gold Circle paid $36,190.16 on the basis of these fraudulent freight bills to Riviera, the factor which purchased Keshun's accounts at a six percent discount.

Rather than pursue its remedy against Keshun, which is bankrupt, Gold Circle commenced this action, alleging that Riviera would be unjustly enriched by its retention of the payment.

The purpose of the trial was to ascertain which of the parties committed errors, mistakes, or oversights or otherwise so conducted its business as to tip the equities against it.

*The Parties, Their Relationship to Each Other and Their Conduct*

Gold Circle is a division of Federated Department Stores, Inc., a Delaware corpo-

ration with its principal place of business located at Worthington, Ohio. Gold Circle is a department store chain selling merchandise at the retail level. At least during 1977 through 1979, Gold Circle conducted business in California through seven regionally located department stores and had 42 department stores nationwide.

Keshun is a California partnership, which formerly did business in San Jose, California. During at least 1977 through April, 1979, Keshun did business as a carrier transporting goods interstate in the State of California. During this period of time, the partners of Keshun were Vincent Hodge and John Hodge.

Riviera is a California corporation with its principal place of business located in Oakland, California. It does business as a factor, i.e., it provides financing to California businesses by purchasing accounts receivable from these business clients at a discount and by collecting the accounts receivable from the clients' respective account debtors. As with other California factors, Riviera sometimes makes such collections on a "non-notification" basis, i.e., payments are remitted to a Riviera post office box without informing the various account debtors that Riviera is financing the client.

Industrial Traffic Corporation is a corporation specializing in the payment of freight bills, and its services were utilized by Gold Circle for the payment of its transportation bills. Hence, payment through Industrial Traffic Corporation must be treated as if paid directly by Gold Circle.

On or about July 12, 1977, Gold Circle hired Keshun's to transport its merchandise within the State of California. Gold Circle paid Keshun for its services after receiving freight bills from Keshun which set forth Keshun's charges for services rendered.

For each shipment made by Keshun, Gold Circle prepared a bill of lading which identified: (1) the Gold Circle store which shipped the goods; (2) the name of the carrier as "Keshun"; (3) the class and weight of the goods shipped; (4) the date of the shipment; and (5) the Gold Circle bill of lading number assigned to the shipment.

In this case all the Gold Circle bill of lading numbers commenced with the prefix "GC7," which identified the shipment as a Gold Circle return to vendor, i.e., a shipment of goods made by Gold Circle back to the vendor which had originally delivered the goods to Gold Circle.

For each shipment involved in this case, the Gold Circle shipping store would retain the original bill of lading and would send that original to Gold Circle's head office in Worthington, Ohio. Keshun was required to have a copy of that bill of lading by PUC regulations.

When Keshun's services were first hired, Gold Circle and Keshun agreed that Keshun's freight bills would not be paid unless: (1) a copy of the corresponding bill of lading was submitted along with the freight bill; and (2) the Gold Circle bill of lading GC7 number was identified on the freight bill. In fact, during a four-month period of 1977, Gold Circle did not pay Keshun's freight bills unless they were first matched to the corresponding bill of lading.

During February, 1978, Keshun agreed to sell its accounts receivable at a six percent discount to Riviera's corporate sister, Riviera Finance of the Peninsula, a separate corporate entity. At that time Riviera (the defendant in this action) had not been formed as a corporation. Riviera Finance of the Peninsula had its principal place of business located in San Jose, California. Pursuant to its agreement to purchase Keshun's accounts receivable, Keshun granted to Riviera Finance of the Peninsula a bookkeeping power of attorney to mail Keshun's freight bills to Keshun's account debtors on a non-notification basis, a fact as to which Gold Circle had no knowledge until April of 1979. Operating on such non-notification basis, Riviera Finance of the Peninsula purchased accounts receivable and received collections from Keshun's account debtors, including Gold Circle.

Mr. Reid Frederickson, an account executive for Riviera Finance of the Peninsula, supervised the collections of Keshun's accounts receivable. During the period

when Riviera Finance of the Peninsula factored Keshun's accounts receivable, he had telephone communications with Gold Circle's employees in which they verified the validity of freight bills purchased from Keshun. During these communications, Gold Circle's employees routinely informed Frederickson that Gold Circle had no problems with freight bills.

During July, 1978, Riviera Finance-East Bay, Inc. (the defendant in this case) was formed as a corporation under the laws of the State of California, and in August, 1978, it appointed as its general manager Frederickson, the individual who had supervised collections of Keshun's accounts receivable while employed with Riviera Finance of the Peninsula. At that time, based upon the experience with Keshun for the period from February, 1978, to August, 1978, Frederickson believed, and it was reasonable that he should, that Keshun was a reliable client.

Pursuant to the agreement entered into by Keshun and Riviera on August 2, 1978, Keshun warranted that each account offered for sale to Riviera was an accurate and undisputed statement of indebtedness owed by Keshun's account debtors to it. This agreement too granted Riviera a power of attorney to mail all of its freight bills to the account debtors, to collect payments from Keshun's account debtors and to handle Keshun's mail.

Sometime during September, 1978, Riviera commenced to purchase Keshun's accounts receivable at a six percent discount and to mail the freight bills to Keshun's account debtors. One of these account debtors was Gold Circle. At that time, as indicated above, Frederickson formed the belief that Gold Circle never had problems with Keshun prior thereto and had proved itself to provide accurate statements of the services rendered by it to Gold Circle.

During the period August 2, 1978, through April 4, 1979, Riviera purchased Gold Circle related freight bills from Keshun which totaled $114,413.10. Riviera paid Keshun the sum of $107,548.31 for these freight bills. Of the $114,413.10 worth of accounts receivable purchased by Riviera,

Gold Circle remitted to Riviera the sum of approximately $69,896.11. Of the amounts paid by Gold Circle, $36,190.16 was paid on the basis of invalid freight bills. For the remaining freight bills which Gold Circle had received from Riviera but for which it has not remitted any payment, Riviera is due the sum of $1,707.45.

To date, Riviera has incurred substantial losses as a result of Keshun's fraud, the exact amount of which remains unclear.

During the fall of 1978, Riviera collected approximately $25,000 of Keshun's accounts receivable from Gold Circle on a non-notification basis. During this same period Riviera's Frederickson made occasional telephone calls to Gold Circle employees in the course of which he asked Gold Circle to inform him on the type of documentation Gold Circle needed in order to pay money on freight bills sent to it. Gold Circle employees responded and stated that all Gold Circle needed on the freight bills was information relating to the store numbers and class numbers of the merchandise which was transported by Keshun.

With the exception of a memo dated March 21, 1979 (when it was too late), from Industrial Traffic Corporation to Keshun (Riviera, as the recipient of Keshun's mail) requesting a bill of lading before payment of three freight bills, no Gold Circle or Industrial Traffic Corporation employees ever informed Riviera that Gold Circle required a bill of lading to be submitted with Keshun's freight bills, or identification of the bill of lading number on the freight bills, in order to get a freight bill paid. In fact, during the period from September, 1978, through December, 1978, Riviera provided all material documentation to Gold Circle which Gold Circle stated it required in order to pay money on Keshun's freight bills.

In August, 1980, Gold Circle promulgated in writing an internal rule relating to the matching of freight bills to the original bill of lading, which states: "All freight bills must be matched to the Bills of Lading received from the stores. *Under no circumstances are freight bills to be passed with-*

out a matching *Bill of Lading from the store."* (emphasis added.) This same internal rule was in effect at Gold Circle during the period 1977 through 1979.

In making payments to Riviera on the basis of Keshun's freight bills during February and March, 1979, Gold Circle violated its internal procedure requiring freight bills to be matched with the original bill of lading prior to being paid. In fact, Gold Circle's traffic manager admits that Gold Circle's failure to comply with its matching bill of lading requirements constituted errors and oversights which should not have been made.

While Gold Circle was required by PUC regulations to promptly pay its freight bills (the so-called 7-day rule), Gold Circle and its agent, Industrial Traffic Corporation, held most of Keshun's freight bills for periods varying from as much as sixteen days to one month, during which period the two companies had adequate opportunity to match the freight bills with the original bill of lading that Gold Circle retained for each shipment transaction.

During the fall of 1978 Gold Circle discovered that some of the shipments of goods by Gold Circle through Keshun to Pickwick International, one of Gold Circle's vendors, were short. On or about September 25, 1978, Pickwick sent a letter to Gold Circle in which it stated that Pickwick was "having a very serious problem with receiving [Gold Circle's] returns short." These returns were being made through Keshun. As a result, during the fall of 1978, Gold Circle informed its stores to stop using Keshun for shipments made to Pickwick and to use Viking Truck Lines instead.

Some of the payments made to Riviera for which Gold Circle seeks restitution were made on the basis of Keshun's freight bills showing services rendered to Gold Circle for shipments to Pickwick during 1979.

Following a visit to the Keshun premises by Bill Host, an employee of Gold Circle, in November or December of 1978, Host found a Keshun truck which contained undelivered Gold Circle merchandise. This discovery and his disbelief of the explanation given him by Vincent Hodge caused him to suspect Keshun of theft, to doubt the trustworthiness of Vincent Hodge, and convinced him that Keshun was disorganized and unprofessional. He conveyed his suspicions of Keshun's theft to Gold Circle's California security manager and to Gold Circle's regional manager. Thereafter, during the final week of December, 1978, or the first week of January, 1979, Gold Circle notified its seven California stores to stop using Keshun's services.

During the period approximately from September, 1978, to April, 1979, Riviera's Frederickson made occasional phone calls to Gold Circle and asked its employees for the reasons why Gold Circle was taking so long to remit payments on Keshun's freight bills. He was informed that Gold Circle and its professional processing company were processing the bills for payment and that they did not have any problems with the freight bills. Consequently, Riviera continued to purchase freight bills from Keshun and to mail the freight bills to Gold Circle for collection in reliance upon such representations.

On or about April 9, 1979, Gold Circle discovered that Keshun had issued between two and thirteen separate invoices for each shipment which Keshun had actually made on behalf of Gold Circle. Gold Circle discovered this by simply noting that some of Keshun's freight bills showed returns of Christmas trees in March, 1979, and thus formed the belief that it had been defrauded.

Thereafter in mid-April, 1979, Joseph Humphrey, Gold Circle's traffic manager, by telephone informed Frederickson of Riviera of his suspicion that Keshun had rendered duplicate or fraudulent freight bills. This was the first occasion on which Riviera had reason to suspect the validity of any Keshun freight bill. Frederickson then informed Humphrey that Riviera had factored Keshun's accounts receivable and had no knowledge of Keshun's duplicate freight bills. No one associated with Riviera suspected or knew of any dishonest activity committed by Keshun prior to April 16 or

17, 1979, when Humphrey informed Frederickson of the suspected duplicate billing. After that phone conversation Riviera stopped purchasing accounts receivable from Keshun.

■ While it is true that Riviera:

(1) made no inquiry as to the background or history of Vincent Hodge and John Hodge and thus had no knowledge of Vincent Hodge's prior conviction for writing bad checks;

(2) made no telephone calls to Gold Circle *before* entering into the agreement with Keshun;

(3) did not review any financial records, statements, books, or other documents of Keshun;

(4) did not require Keshun to show any proof of delivery for any of the invoices it bought from Keshun to send to Gold Circle;

(5) had access to Keshun's books, if it desired to examine them;

(6) deleted the address of Keshun and inserted Riviera's address on every invoice before sending it to Gold Circle;

(7) failed to advise Gold Circle that it was a factor for Keshun until mid-April, 1979; and

(8) failed to check with Keshun's bank reference; the fact remains that Riviera was not a *lender* but a *factor* and hence not legally obligated to conform to the standards of the lending community. The factor relies upon the account debtor's experience with the assignor (which it did) as the true indicia of the validity of the accounts.

*Effect of Above Findings*

■ Based upon the foregoing findings, Gold Circle has failed to sustain its burden of proving that it would be "unconscionable" for Riviera to retain payments made on the accounts for which value had been given. To prevent recovery for the plaintiff, "the defendant's right need not be better than that of the plaintiff. On the contrary, the plaintiff must prove that he has a better right to the money than the defendant has, and cannot prevail if their rights are equal." 55 Cal.Jur., Restitution

§ 33, at 346–347 (3d ed. 1980) (citing *Bastanchury v. Times-Mirror Co.,* 68 Cal.App.2d 217, 155 P.2d 488 (1945)). In this case the equities clearly balance in favor of Riviera and against Gold Circle.

As to Gold Circle's argument that Riviera did not follow its standard form of agreement with Keshun by requiring that proof of delivery be attached to each invoice, the evidence is undisputed that the parties agreed this was not done because Gold Circle did not, during the relevant period, require a copy of the bill of lading to be submitted along with the freight bill. Quite the contrary, Frederickson testified that it was not required and that he provided all material information to Gold Circle which the company required.

It is undisputed that Riviera paid $107,-548.31 for Gold Circle related accounts having a face value in the amount of $114,-413.10. It did so in good faith since its decision to commence factoring Keshun's accounts receivable in August of 1978 was based upon the fact that Keshun and Gold Circle had established a good record during February, 1978, through July, 1978 (the period during which Riviera Finance of the Peninsula factored Keshun's Gold Circle accounts), and upon the further fact that Frederickson verified the validity of Keshun's Gold Circle accounts by telephoning Gold Circle and Industrial Traffic Corporation employees both during his employment with Riviera Finance of the Peninsula and later as general manager of Riviera.

Riviera received the payments from Gold Circle without notice of Keshun's dishonest practices. The dates of Industrial Traffic Corporation's checks issued on the basis of Keshun's invalid freight bills establish that the payments were made between February 8, 1979, and March 29, 1979. However, Riviera did not receive notice of Gold Circle's suspicions until mid-April, 1979. Although Gold Circle suspected Keshun of theft in December of 1978 and although it knew that Pickwick had reported "very serious" problems with Keshun's return shipments coming up short during September, 1978, there is no evidence to suggest that

Riviera had notice of these problems prior to mid-April of 1979, nor is there any evidence that Riviera knew that Gold Circle was violating its own internal freight bill processing procedures which required the freight bills to be matched to Gold Circle's original bill of lading.

The court concludes that in this case Riviera purchased Gold Circle accounts for value, in good faith and without notice of Keshun's fraud or Gold Circle's mistakes. Riviera is therefore entitled to retain the payments it received. *Weiner v. Roof*, 19 Cal.2d 748, 122 P.2d 896 (1942).

■ In *Weiner*, Justice Traynor applied the principle of a bona fide purchaser to deny restitution to plaintiff. That principle holds that a defendant-assignee who has obtained money or other property from a plaintiff, for value and in good faith, takes free of any equitable claims against the defendant's retention of the money and that the plaintiff's proper remedy is against the party that actually committed the fraud:

> If the third party has no notice of the claims of the original owner, he is a bona fide purchaser for value and may keep the amount as against the original owner, whose only remedy is against the principal on the grounds of fraud, mistake, or unjust enrichment.

*Weiner v. Roof, supra*, at 752, 122 P.2d 896.

■ The equities in this case demand that the losses of Gold Circle and Riviera remain where they have fallen. Despite the fact that the equities favor defendant, Gold Circle argues that California Uniform Commercial Code § 9318 grants it an independent cause of action against Riviera.[1] This section provides in part:

Defenses Against Assignee; Modification of Contract After Notification of Assignment; Term Prohibiting Assignment Ineffective; Identification and Proof of Assignment.

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9–206 the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom.

Since there are no reported California cases interpreting this section, this court must determine how the Supreme Court of California, whose law is to be applied in this diversity action, would resolve the legal question. The court is satisfied that California would follow the weight of the authority as expressed by the First Circuit on December 4, 1981, *Michelin Tires v. First National Bank of Boston*, 666 F.2d 673, wherein the court ruled that it was *not* the intent of section 9318 to create an affirmative right to bring an independent action against the assignee.[2] In reaching this conclusion, the court commented:

> The key statutory language is ambiguous. That "the rights of an assignee are *subject to* ... (a) all the terms of the contract" connotes only that the assignee's rights to recover are limited by the obligor's rights to assert contractual defenses as a set-off, implying that affirmative recovery against the assignee is not intended. *See Englestein v. Mintz*, 345 Ill. 48, 61, 177 N.E. 746, 752 (1931), *quoted*

---

1. Gold Circle also argues that the double payment provisions set forth in paragraph 44 of the agreement between Riviera and Keshun requires Riviera to make restitution to Gold Circle. Actually, paragraph 44 only states that Riviera should pay back a payment made twice on a *single* invoice. That is not the situation here. Riviera has not received double payments on a single invoice. It paid value for each invoice it received. Gold Circle's own witness, Joseph Humphrey, testified that the problem which arose in this case was not one of "double payments."

2. In reaching its conclusion the court made a careful analysis of those cases which allowed affirmative claims, at least in limited circumstances, *Benton State Bank v. Warren*, 263 Ark. 1, 562 S.W. 74 (1978); *Farmers Acceptance Corp. v. DeLozier*, 178 Colo. 291, 496 P.2d 1016 (1972); *K-Mart Corp. v. First Penn. Bank*, 29 UCC Rep.Serv. 70 (Pa.1980), and rejected them as not truly applicable to a situation such as that which exists in the present case.

in *Anderson v. Southwest Savings & Loan Association,* 22 U.C.C.Rep.Serv. 1275, 1277 (Az.Ct.App.1977):

> The words "subject to," used in their ordinary sense, mean "subordinate to," "subservient to," or "limited by." There is nothing in the use of the words "subject to," in their ordinary use, which would even hint at the creation of affirmative rights.

On the other hand, the use of the word "claim" raises the possibility that affirmative recovery was indeed contemplated. However, the section's title and the official Comment support the view that the section does not create affirmative rights. The title reads, "Defenses Against Assignee." Official Comment 1 states in pertinent part:

> Subsection (1) makes no substantial change in prior law. An assignee has traditionally been subject to defenses or set-offs existing before an account debtor is notified of the assignment.

Convinced that subsection (1) makes no substantial change in prior law, the court does not anticipate that the Supreme Court of California would permit an extension of section 9318 in the manner urged by plaintiff, and the court is unwilling to do so in this case.

Therefore, judgment shall enter in favor of Riviera and against Gold Circle, with each party to bear its own costs.

The foregoing opinion constitutes the court's findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure. Defendant is directed to submit a form of judgment in accordance with Local Rule 260.1.