Present:  Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and
Kinser, JJ., and Compton, Senior Justice


DAVID L. CAUDILL, ET AL.
                                        OPINION BY
v.  Record No. 990891        SENIOR JUSTICE A. CHRISTIAN COMPTON
                                      April 21, 2000
COUNTY OF DINWIDDIE, ET AL.


                FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
                     William L. Wellons, Judge Designate

     In this public finance case, the simple issue that has

evolved, in a complicated bond deal used in connection with a

plan to convert a county's trash to mulch, is whether the

parties to one of the contracts involved could change a

provision relating to the release of funds, to the alleged

prejudice of bondholders.

     This controversy arises from an unsuccessful attempt to

provide a new system of solid waste disposal in Dinwiddie

County.  In July 1997, David L. Caudill and other individual

plaintiffs (the bondholders), and Signet Trust Company, as

Trustee under an Indenture of Trust, filed the present action

seeking damages and declaratory relief.  Named as defendants,

among others, were the County of Dinwiddie; the County

Administrator; the Industrial Development Authority of Dinwiddie

County, Virginia; several entities comprising the underwriter of

the bonds and some of the entities' officers (collectively, the

Carter Kaplan defendants); Virginia Bio-Fuel Corporation (VBC); and two of VBC's officers.

Responding to a seven-count complaint, the defendants filed demurrers and other pleadings. By agreement of the parties, 105 separate documents comprising over 1300 pages, including documents originally attached as exhibits to the motion for judgment, were deemed a part of the motion for judgment for purposes of demurrer.

Following briefing and argument, the trial court issued an exhaustive letter opinion. In a January 1999 order incorporating the opinion by reference, the court sustained the demurrers and dismissed the motion for judgment as it related to six of the seven counts. The plaintiffs appeal.

We shall recite the factual allegations of the motion for judgment as if they are true, because a demurrer admits the truth of all properly pleaded material facts. A demurrer, however, does not admit the correctness of the pleader's conclusions of law. Ward's Equip., Inc. v. New Holland N. Am., Inc., 254 Va. 379, 382, 493 S.E.2d 516, 518 (1997). Moreover, we will consider, as did the trial court, not only the substantive allegations of the motion for judgment but also the documents stipulated by the parties to be a part of the declaration for the purpose of ruling on the demurrer. See

Flippo v. F & L Land Co., 241 Va. 15, 17, 400 S.E.2d 156, 156 (1991).

In 1991, Dinwiddie County operated a landfill for the disposal of municipal solid waste generated by County citizens. During the Spring of 1991, County officials began discussions with, among others, VBC regarding a new, integrated, and comprehensive plan of solid waste management for the County. A plan was developed under which recyclable materials would be sorted from waste and sold, bio-degradable waste would be mixed with sewage sludge to create mulch, and the remaining waste would be shipped to a landfill outside the County.

In order to implement the plan, the County entered into three contracts with VBC in 1992: A Closure Contract for closure of the existing landfill; a Construction Contract for building a materials recycling and a co-composting facility; and an Operations Contract for operation of that facility.

According to the Operations Contract, the County would, upon commencement of the operation of the recycling and co-composting facility, pay VBC $29.50 per ton for each ton of waste processed by that facility. The date for commencement of payment by the County was to be established by the issuance of a Certificate of Commencement Date as set forth in the contract. The certificate merely stated the commencement date and provided

that it would not be valid unless initialed by representatives of the County and VBC.

The Operations Contract and the Construction Contract set forth criteria for issuance of the Certificate of Commencement Date.  The criteria included a 60-day test period following the completion date (the date the facility received all regulatory permits and was in full operation), and an evaluation by an Operations Committee.  The County was required to pay for the processing only after the criteria had been met.

The project was financed by means of bonds issued by the defendant Industrial Development Authority.  Two of the bond issues were intended to finance closure of the landfill and the construction of the building that would house the facility.  Those two bond issues, not the subject of this dispute, were backed by the full faith and credit of the County.

This controversy involves $3 million in Equipment Bonds issued by the Authority to finance the purchase and installation of the equipment for the recycling and co-composting facility.  The Carter Kaplan defendants, underwriter for the bond issue, purchased the bonds from the Authority for resale to the general public.  These bonds were sold by means of an Offering Statement that was approved by the Authority and VBC, and distributed to prospective purchasers.

The funds received by the Authority from the sale of the Equipment Bonds were loaned by the Authority to VBC under the terms of a Loan Agreement and a $3 million Promissory Note executed by VBC and payable to the Authority. The Note was secured by the equipment pursuant to a security agreement between the Authority and VBC. This Note was assigned to Signet Trust Company, as Trustee for the benefit of the bondholders.

As additional security for payment of the Equipment Bonds, VBC, through a document entitled Assignment of Revenues, assigned to the Authority VBC's right to receive "tipping fees" from the County for processing waste. Then, with the County's consent, the Authority assigned the right to this income to the Trustee, by a Consent and Estoppel Agreement, for payment of the Equipment Bonds.

The Authority and the Trustee entered into an Indenture of Trust dated April 15, 1993. The Indenture provided that proceeds from the sale of the Equipment Bonds were to be deposited in an Equipment Fund held by the Trustee. Monies from the Equipment Fund were to be used to pay the cost of acquisition and installation of the equipment necessary to operate the facility. According to the Indenture, only the liquidation value of the equipment was to be released to VBC upon receipt of requisition forms prior to receipt of the Certificate of Commencement Date. The Indenture further

5

provided that the disposition of the balance in the Equipment Fund was to be released only when the Trustee "shall have received" a copy of the duly authenticated Certificate of Commencement Date. The Indenture defined "Commencement Date" as "the date established in Exhibit D of the Operations Contract."

A Bond Book, given to all Equipment Bond purchasers, contained copies of the Offering Statement, Indenture, Consent and Estoppel Agreement, Assignment of Revenues, security agreement, Loan Agreement, Note, and Operations Contract.

Upon the request of VBC and with agreement of the County's Board of Supervisors, the County and VBC entered into an Escrow Agreement on March 4, 1994. In this document, the parties agreed that the County and VBC would certify that the "Commencement Date" had occurred upon receipt of a certificate from an engineering firm, retained by VBC, that the project had been constructed in accordance with the plans and specifications set forth in the Construction Contract. As the trial court pointed out, "The Escrow Agreement effectively modified the Operations and Construction Contracts by substituting the engineer's certificate for the evaluation criteria and other prerequisites to issuance of the Certificate of Commencement Date contained in the original Operations Contract."

On March 4, VBC, pursuant to the Escrow Agreement, submitted its fifth and final requisition against the Equipment

Fund to the Trustee.  Attached to the final requisition was a copy of the first page of the Escrow Agreement and a copy of the Certificate of Commencement Date, Exhibit D, initialed on behalf of the County and VBC, which read, in part:  "The Commencement Date is March 4, 1994."

The Trustee then disbursed the balance in the Equipment Fund of approximately $1.7 million to various individuals and entities in the amounts directed by VBC.  The plaintiffs allege that by procuring the disbursement of the balance of the Equipment Fund, the County, VBC, and other defendants avoided provisions of the Indenture, which provided that the Equipment Bonds were subject to mandatory redemption on July 15, 1994 if final disbursement from the Equipment Fund had not occurred by May 31, 1994.

On September 27, 1994, VBC informed the County that it was unable to fulfill its outstanding obligations under the Closure, Construction, and Operations Contracts, and that it would promptly cease doing business.  VBC never was able to operate the equipment successfully and ceased business operations at the site on October 5, 1994.

Subsequently, VBC defaulted on payment of the Equipment Bonds, and the County refused the Trustee's demand that the County cure the default.  The present action is part of ongoing litigation that ensued in federal and state courts beginning in

7

1995.  See, e.g., Gasner v. Board of Supervisors, 103 F.3d 351 (4th Cir. 1996).

On appeal, the plaintiffs argue that the Indenture had a two-part mechanism to protect the bondholders if the facility did not work.  First, they note, the bondholders had a security interest in the equipment; until the facility was operational, only the liquidation value of the equipment ($1.3 million) could be paid to the borrower, VBC, from the Equipment Fund.  Second, they say, the remainder of the bondholders' money in the Equipment Fund ($1.7 million) could be paid to VBC only if the facility was tested and actually worked.  According to the plaintiffs, "Once it worked, VBC and the County could issue a Certificate of Commencement Date and present it to the Trustee.  Then and only then would the rest of the Equipment Fund be disbursed."

Continuing, the plaintiffs state that just over a year after the bondholders invested in the project, the facility failed to work and was abandoned, the Equipment Bonds were in default, and their money held in trust was released.  The plaintiffs ask, "Why?", and answer, "Because when County officials, VBC and other Defendants learned that the Facility would and could not work, they acted to save themselves and sacrifice the Bondholders' security.  They issued a Certificate

8

of Commencement Date regardless of whether the Facility worked or not."

Elaborating, the plaintiffs state the defendants "did this" without notice to the bondholders and even presented a "false" certificate to the Trustee. And, the plaintiffs assert, "The Trustee had no idea that it was being tricked into believing that the Facility had been tested and actually worked. Consequently, over one and a half million dollars was released to VBC and its creditors, even though all Defendants knew that the Facility had not been tested and did not work."

The plaintiffs, arguing that the trial court erred in sustaining the demurrers, advance on appeal a number of theories of recovery that were set forth in the several counts of the motion for judgment. Principally, they assign error to the trial court's rulings that the motion for judgment, supplemented by the documents, failed to set forth facts sufficient to support claims based on breach of contract, third-party beneficiary, assignment, actual and constructive fraud, taking of property for public use without just compensation, conversion, and conspiracy or aiding and abetting.

However, during oral argument of the appeal, the plaintiffs correctly state that the "key issue" is whether the defendants could change "with impunity" the definition of "Commencement Date" in the Operations Contract "so as to affect the rights of

9

the Bondholders and Trustee under the Indenture, and if they could not, do the plaintiffs have any recourse against the defendants to get their money back?"

Also during argument, the defendants more appropriately state the sole question to be decided. They say that the case "has come down to one issue: Could the Operations Contract be amended by the parties to that contract?" The defendants correctly observe that if that query is answered in the affirmative, all other claims of the plaintiffs fail. We respond to that question in the affirmative.

The Operations Contract between the County and VBC, to which the plaintiffs were not parties, expressly reserved to the County and VBC the right to amend that agreement. Section 5.2 titled "Amendments to Contract," provided, as pertinent, "This Contract shall not be amended or supplemented unless in writing by the parties after approval of the same by resolution adopted by the Board of Supervisors of the County. . . ." Therefore, the County and VBC were free to disregard the testing provisions and issue the Certificate of Commencement Date upon receipt of the engineering firm's certificate that the facility had been built in accordance with the plans and specifications, although it was not operational.

Furthermore, contrary to the plaintiffs' contention, the mention of "Commencement Date" in the Indenture, which could not

10

be amended without the bondholders' consent, does not incorporate by reference the Indenture into the Operations Contract. Those two documents were executed by different parties at different times addressing different subject matter. Two such totally dissimilar documents cannot be construed as one contract.

Nonetheless, the plaintiffs contend that they are third-party beneficiaries of the Operations Contract testing provisions and that their consent should have been required prior to any change of any obligations of the parties to the contract. They argue that the County and VBC breached a duty to them by amending the Operations Contract and signing the Certificate of Completion Date prior to compliance with the evaluation criteria thereby inducing the Trustee to release the funds before VBC had demonstrated that the facility would operate effectively. Because of this alleged breach, the plaintiffs assert, the balance in the Equipment Fund was released and was not available to partially reimburse the bondholders for their loss.

We have enforced a third-party beneficiary's claim when the third party establishes that the parties to the underlying contract clearly and definitely intended to confer a benefit upon the alleged beneficiary. MNC Credit Corp. v. Sickels, 255 Va. 314, 320, 497 S.E.2d 331, 334 (1998); Levine v. Selective

11

Ins. Co., 250 Va. 282, 286, 462 S.E.2d 81, 83 (1995); Ward v. Ernst & Young, 246 Va. 317, 330, 435 S.E.2d 628, 634 (1993). See Code § 55-22.

However, there is no provision, express or implied, of the Construction Contract or the Operations Contract that clearly and definitely shows an intent to confer a benefit upon the bondholders or Trustee as third-party beneficiaries of those contracts. Indeed, the Trustee and bondholders did not even exist when those contracts were executed.

Additionally, the plaintiffs contend they had a right to object to modification of the Operations Contract because they were assignees of the substantive provisions of that contract by virtue of the Assignment of Revenues. There is no merit to this contention.

Under the Assignment of Revenues, there was merely an assignment of the right to receive revenues; there was no assignment of other rights or obligations under the Operations Contract. The Assignment, between VBC and the Authority, provided, "The parties agree that the Authority shall be entitled to receive payment of the Revenues but shall not otherwise have any obligation to perform any of the duties of Assignor [VBC] under the Contract."

Clearly, the terms of the Assignment and the Estoppel Agreement demonstrate that the parties intended to assign VBC's

right to receive "tipping fees" as additional security for payment of the Note. "Tipping fees" were the revenues received for solid waste delivered to and treated at the recycling and co-composting facility. The limited assignment was the assignment of only the future right to receive payments from the County when and if the facility became operational. The mere assignment of a future contingent right to proceeds or to a future stream of income does not confer other rights on the assignees. See BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 696 (2nd Cir. 1993); United States ex rel. Henry Walke Co. v. Van de Riet, 316 F.2d 912, 915 (4th Cir. 1963).

Moreover, as the trial court observed, "if the Trustee was relying on the testing provisions of the Operations Contract in accepting the Assignment of Revenues as security for the Note, it could have insisted on the inclusion of a provision in the Assignment to that effect requiring that VBC and the County not amend those provisions." However, the Trustee did not include such provisions in either the Assignment or the Consent and Estoppel Agreement, even when Section 5.2 of the Operations Contract permitted, without limitation, modification of that contract by the parties.

Consequently, because the parties to the Operations Contract had the absolute right to modify its terms and because the plaintiffs had no right as third-party beneficiaries or

13

assignees to object to the modification, the motion for judgment is wholly insufficient to state a claim for which relief can be granted based upon breach of contract in Equipment Fund disbursement.

Inasmuch as the "key issue" on appeal has been decided against the plaintiffs, their other theories of recovery, which we have considered and reject, fail, as we already have said.

Therefore, we hold that the trial court correctly sustained the demurrers, and the judgment below will be

<u>Affirmed</u>.