## CIRCUIT COURT OF THE CITY OF NORFOLK

Woodbury Const. Co.

v.

Commercial Cash Flow, L.L.C.,
t/a Beach Commercial Finance

February 19, 2002

· Case No. (Law) L00-2865

BY JUDGE CHARLES E. POSTON

Today, the Court grants the defendant's motion for summary judgment and denies the plaintiff's summary judgment motion.

The plaintiff, Woodbury Construction Company, was the general contractor on a project to construct an Operations Center for the City of Norfolk Utilities Department. Woodbury awarded Falcon Construction Company a subcontract in connection with this project. Under the subcontract, Falcon agreed to "furnish all labor, equipment, tools, and materials" necessary to perform the contract. (Subcontract at 1.) Falcon subsequently entered into a Credit Financing Agreement ("CFA") with Beach Financing Corp. Under this agreement, Falcon could "obtain short term financing by selling, factoring, and assigning to [Beach] certain invoices at a discount below face value." Falcon sold several invoices to Beach under the terms of the CFA. Falcon subsequently failed to pay its material suppliers for materials provided in connection with the Operations Center Project. As general contractor, Woodbury was forced to make materials payments for which Falcon was contractually liable. To recover this sum, Woodbury sued Beach, arguing that, through accepting the assignment of Falcon's invoices, Beach had impliedly accepted a delegation of Falcon's performance obligations to Woodbury. Both parties have moved for Summary Judgment.

A trial court may grant summary judgment only if no material fact is genuinely in dispute. Va. Rules 3:18. Because the questions posed by the instant case are purely questions of law, summary judgment for the defendant is appropriate.

When a contract's terms are clear and unambiguous, the meaning of those terms is a pure question of law. *Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C.*, 258 Va. 524, 528 (1999) (*citing Gordonsville Energy, L.P. v. Virginia Elec. & Power Co.*, 257 Va. 344, 352-53 (1999), and *D. C. McClain, Inc. v. Arlington County*, 249 Va. 131, 135 (1995)). Whether a particular contract is ambiguous is also a question of law. *Pollard* at 528 (*citing Westmoreland-L. G. & E. Partners v. Virginia Elec. & Power Co.*, 254 Va. 1, 10 (1997), and *Tuomoloa v. Regent Univ.*, 252 Va. 368, 374 (1996)). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Wilson v. Holyfield*, 227 Va. 184, 187 (1984) (*citing Meade v. Wallace*, 226 Va. 465 (1984), and *Magann Corp v. Electrical Works*, 203 Va. 259, 264 (1964)). Contracts are not rendered ambiguous merely because the parties disagree on their meaning. *Wilson* at 187 (*citing Manss-Owens Co. v. Owens & Son*, 129 Va. 183, 197 (1921)).

Applying these principles to the instant case, it is obvious that Beach did not assume Falcon's obligations to Woodbury. The provision of the CFA most favorable to Woodbury states that Falcon "may, in the normal course of business, obtain short term financing by selling, factoring, and assigning to [Beach] certain invoices at a discount below face value." (CFA, preamble.) "Invoice" is defined, in relevant part, as "Any presently existing or hereafter acquired . . . contract right . . . arising or resulting from . . . the rendering of services." (CFA, § 1.7.) Thus, the plain language of the CFA evinces an intention for Falcon to transfer its rights, but no intention to transfer its obligations. If Beach and Falcon had intended to transfer any or all of Falcon's obligations to Woodbury, one would expect the CFA, a ten-page, single-spaced document, to contain an affirmative statement that the obligations were being transferred and language governing Beach's discharge of the obligations. The fact that the CFA contains no such language compels the conclusion that the parties to it did not intend to transfer any of Falcon's performance obligations to Beach.

Woodbury argues that "an assignment of rights under a contract . . . carries with it the burden of the liabilities under that contract." (Plaintiff's brief at 5.) Woodbury relies upon *Pollard & Bagby v. Pierce Arrow, L.L.C.*,

258 Va. 524, 528 (1999), and *Economic Water Heating Corp. v. Dillon Supply Co.*, 156 Va. 597, 606 (1931).

The Court disagrees with Woodbury's interpretation of Virginia law. There is at least one recent case in which the Virginia Supreme Court made clear that an obligee can assign the benefits of a contract without delegating the burdens. *Caudill v. County of Dinwiddie*, 259 Va. 785, 793 (2000). In *Caudill*, a waste management company assigned to Dinwiddie County its right to receive fees for handling waste. The Supreme Court held that "there was merely an assignment of the right to receive revenues, there was no assignment of other rights or obligations under the Operations Contract." *Id.*

The cases cited by Woodbury for the proposition that the benefits and burdens of a contract must travel together are inapposite. The language Woodbury quotes from *Economic Water* clearly deals with the *assumption* of contracts, not assignments.[1] *Pollard*, which involves a curious and unusual fact pattern, only superficially supports the plaintiff's position.

*Pollard* involved a dispute resulting from the sale of a rental property. In this case, the plaintiff had a contract with the owner of a rental property under which the plaintiff would act as leasing agent and receive 6% of the rental income from leases of the property. Pollard was also to collect 6% of the income generated by any renewals or extensions of the leases he brokered. After the execution of this contract, the defendant purchased the rental property. The defendant paid Pollard his commission until the existing leases expired, then re-let the property to the existing tenants and refused to pay Pollard further commissions. The Supreme Court held that Pollard was entitled to receive commissions from the defendant because "an assignee of a contract obtains his rights from the assignor and, thus, stands in the shoes of the assignor and acquires the same rights and liabilities as if he had been an original party to the contract." *Id.* at 524.

However, *Pollard* does not stand for the proposition that the benefits and burdens of a contract universally travel together. The Supreme Court's holding in *Pollard* was driven by the curious procedural posture of that case. The court began its analysis by observing:

> that the trial court held that there was an assignment of the leases from Simmons to [defendant] when Simmons conveyed the property.

---

[1] "When a party assumes the contract of another, the party makes it his own contract and becomes accountable for the other's responsibilities under the contract." (Plaintiff's Brief at 5 quoting *Economic Water* at 606.)

Since [the defendants] have not asserted cross-error in this ruling, it became the law of the case and is not before us on appeal.

*Id.* at 527-28. A footnote to this passage revealed, "There is no verification or documentation of any assignment in this record." *Id.* at 527. In *Pollard,* then, the Supreme Court was interpreting the legal effect of an assignment without the benefit of any document memorializing its terms. Thus, *Pollard* states a default rule of interpretation rather than an inflexible rule of law.

This view of *Pollard* is bolstered by two facts. First, in *Caudill* the Supreme Court held that the benefits of a contract could be assigned without delegating the burdens. It did not cite *Pollard* as contrary authority. The Supreme Court would not have reversed itself so lightly. Second, the "default rule" view of *Pollard* accords with the *Restatement,* which specifies:

Unless the language or the circumstances indicate the contrary, *as in an assignment for security,* an assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.

*Restatement of the Law (Second), Contracts* § 328(1) (emphasis added). In *Pollard,* the Supreme Court concluded that both the benefits and burdens of the plaintiff's contract had been assigned only because there was no written assignment agreement in the record to contradict the presumption. The *Restatement* rule is the best way of reconciling the superficially divergent results of *Caudill* and *Pollard* and is therefore the best available embodiment of the Virginia law of assignments.

Applying the *Restatement* rule, it follows that the language of the CFA and the circumstances under which it was executed rebut the presumption that the CFA assigned both the benefits and burdens of Falcon's contract with Woodbury. The preamble to the CFA clearly and unambiguously indicates that the purpose of the agreement is "short term financing." The word "finance" means "to supply with funds." *Black's Law Dictionary* 568 (7th ed., 1999). Thus, financing entails the provision of funds in exchange for equities or a promise of repayment. In the instant case, the "assignment" of Falcon's invoices to Beach was undertaken only to insure that Beach would receive repayment of a short term financing loan. Thus, the assignment of Falcon's right to receive payment from Woodbury was an "assignment for security," a transaction that the *Restatement* explicitly exempts from its presumption that an assignment of benefits also effects a delegation of duties.

This construction is bolstered by a careful analysis of the CFA. Under the CFA, Falcon sold its rights to receive payment of its invoices to Beach. In exchange, Beach agreed to pay Falcon a "Downpayment" [*sic*] of 81% of the face value of the invoices, payable at the time of sale. Beach further agreed to make Falcon a "Settlement" payment that would bring the total of payments to between 95% and 99.5% of the payment made by Woodbury on Falcon's invoices.[2] Woodbury's proposed construction of the CFA would have Beach assume Falcon's performance obligations to Woodbury in addition to agreeing to pay Falcon between 95 and 99.5% of the price of those services. In effect, Woodbury urges a construction under which Beach would agree to assume Falcon's obligations in exchange for between 0.5% and 5% of the payment due Falcon. The assignment of Falcon's right to receive payments from Woodbury did not effect a delegation of its contractual duties.

Woodbury relies upon *Benton State Bank v. Warren*, 562 S.W.2d 74 (Ark. 1978), for the proposition that "an assignee bank is liable to a general contractor for an assignor subcontractor's failure to pay its material suppliers." *Id.* at 76. However, this interpretation of *Warren* neglects the *ratio decidendi* of the Arkansas Supreme Court. The court wrote, "The sole question is whether the loss should be borne by the bank or by the Warrens. As we view the case, that question in turn depends upon which was more seriously at fault in allowing the loss to occur." *Id.* at 74. The Arkansas Supreme Court imposed liability on the bank because:

> The bank knew that the Harps had been compelled to borrow a large sum to pay delinquent federal taxes. It knew that another bank had refused to make the loan. It was in close touch with the Harp's financial difficulties and knew, for instance, that shortly before the last progress payment was made, at least seven checks written by the Harps on the bank had been dishonored. It had solid reasons for suspecting the Harp's assertions . . . that all past due bills for labor and materials had been paid.

*Id.* at 76. In the instant case, the plaintiff has not contended that the defendant knew or should have known that Falcon was likely to default on its contractual obligations to Woodbury. Thus, the reasoning of *Warren*, even if controlling, would not compel judgment for the plaintiff.

---

[2] The exact amount paid by Beach depended upon how quickly Woodbury paid the invoices securing the transaction.

Moreover, *Warren* has been roundly criticized by other courts. The leading case on this subject is *Michelin Tires (Canada) Ltd. v. First National Bank of Boston*, 666 F.2d 673 (1st Cir., 1981).[3] The facts of *Michelin* were eerily similar to those of the instant case. The plaintiff, a tire manufacturer, hired J. C. Corrigan ("JCC") to build a system that was to form part of its Nova Scotia factory. Subsequently, JCC entered into a financing agreement with First National Bank of Boston ("FNB") under which JCC could borrow up to 80% of the value of its unpaid invoices. As collateral, FNB took a security interest in the invoices. When JCC defaulted on its contractual obligations to the plaintiff, the plaintiff attempted to recover from the bank, arguing that U.C.C. § 9-318(1)(a) gives obligors a right to recover from the assignees of their obligees. The First Circuit, *per* Judge Mazzone, rejected the plaintiff's contention.

The First Circuit reasoned that allowing suits by obligors against assignee financial institutions "would 'make every banker, who has taken an assignment of accounts for security purposes, a deep pocket surety for every bankrupt contractor in the state to whom it had loaned money'." *Id.* at 679 (*quoting Warren* 562 S.W.2d at 77 (Byrd, J., dissenting)). Such suits would increase transaction costs by forcing creditor-assignees to monitor the performance of their assignors. Because general contractors already have an incentive to monitor the performance of their subcontractors, this added monitoring would squander precious resources while accomplishing nothing. "Banks will be given additional burdens of supervision, [but] there would be no corresponding reduction in vigilance by contracting parties, thus creating two inspections where there were formerly one. Costs for everyone thus increase, without any discernible benefit." *Michelin Tires* at 679-80. For these reasons, *Warren*, a non-controlling opinion of a sister state, has little persuasive value to this court.

The overwhelming trend among both state and federal courts is to hold that an obligor may not recover against an assignee financial institution for an assignor's breach of its contractual obligations. Prior to *Michelin*, some courts had permitted an obligor to recover restitution from an assignee, though

---

[3] *Michelin* differs from the case at bar in that *Michelin* dealt with an obligor's rights under U.C.C. § 9-318(1)(a), whereas Woodbury asserts a common law claim for breach of contract. Nevertheless, *Michelin* and its progeny are instructive for their policy discussion of the rights of obligors and assignees in transactions where an obligee's trade receivables are assigned to secure a loan. The force of these policy considerations is in no way blunted by Woodbury's decision to style its claim as one for common law breach of contract.

generally only when the assignee had intimate knowledge of the assignor's affairs. *See Warren*, 562 S.W.2d 74 (Ark. 1978); *Farmer's Acceptance Corp. v. DeLozier*, 496 P.2d 1016 (Col. 1972); *Massey-Ferguson Credit Corp. v. Brown*, 567 P.2d 440 (Mont. 1977). *But see contra Meyers v. Postal Finance Co.*, 287 N.W.2d 614 (Minn. 1979); *Anderson v. Southwest Sav. and Loan Ass'n*, 571 P.2d 1042 (Ariz. App. 1977). However, since *Michelin*, innumerable decisions have adopted its holding and rejected the restitutionary rule. *See Cuchine v. H. O. Bell, Inc.*, 682 P.2d 723 (Mont. 1984); *Lawson State Community College v. First Continental Leasing Corp.* 529 So. 2d 926, 931 (Ala. 1988); *Lydig Const. Inc. v. Ranier Nat. Bank*, 697 P.2d 1019 (Wash. App. 1985); *Murr v. Selag Corp.*, 747 P.2d 1302, 1309 (Idaho App. 1987) (endorsing the *Michelin* rule in *dictum*); *H. John Homan Co. v. Wilkes-Barre Iron & Wire Works, Inc.*, 558 A.2d 42 (N.J. Sup. Ct. 1989); *Patton v. McHone*, 822 S.W.2d 608, 618 (Tenn. App. 1991); *Irrigation Ass'n v. First Natl. Bank*, 773 S.W.2d 346, 349 (Tex. App. 1989); *Phil Greer & Associates, Inc. v. Continental Bank*, 614 F. Supp. 423 (E.D. Pa. 1985) (predicting the Pennsylvania Supreme Court would follow *Michelin* and distinguishing *K Mart, supra*, on its facts); *Gold Circle, etc. v. Riviera Finance-East Bay*, 540 F. Supp. 15 (N.D. Cal. 1982) (predicting that the California Supreme Court would follow *Michelin*)

The Court grants defendant Beach's Motion for Summary Judgment and dismisses Woodbury's Motion for Judgment.